# United States Court of Appeals
## FOR THE EIGHTH CIRCUIT

_____

No. 07-1028

_____

Leiloni Popoalii,                                    *
                                                     *
            Appellant,                               *
                                                     *    Appeal from the United States
      v.                                             *    District Court for the
                                                     *    Western District of Missouri.
Correctional Medical Services;                       *
Earl Cox, Dr.; Raymond                               *
Bloomquist, Dr.; Sripatt Kulkanthorn;                *
Marilyn Meyer; Wendy Hull;                           *
Debbie Welch; Vanlandingham;                         *
Vickie Dixon; Bruce Sharp;                           *
Mark Trusty; Renee Samm; Ann White;                  *
Stephen Taylor; Christina Hancock;                   *
Linda Rose; Jim Dunn; Jim Wilder;                    *
Scott Neagle; William Vallier;                       *
Alan Ham; George Foster; Lisa                        *
Schoenboom; C Nichols; and Morris,                   *
                                                     *
            Appellees.                               *

_____

Submitted: October 17, 2007
Filed: January 10, 2008

_____

Before BYE, BOWMAN, and SMITH, Circuit Judges.

_____

SMITH, Circuit Judge.

Leiloni Popoalii brought this action under 42 U.S.C. § 1983 against Correctional Medical Services' (CMS) and Missouri Department of Corrections' (MDOC) staff, and Dr. Raymond Bloomquist. Popoalii claims that these defendants acted with deliberate indifference to her serious medical needs while she was incarcerated in the Women's Eastern Reception Diagnostic and Correctional Center (WERDCC). The district court[1] granted summary judgment in favor of the defendants, struck an expert affidavit filed by Popoalii, and denied Popoalii's requests to amend her complaint. Popoalii appeals the district court's grant of summary judgment, its denial of her motions to amend her complaint, and its grant of defendants' motion to strike her expert affidavit. We affirm.

## I. *Background*

We recite the facts in the light most favorable to Popoalii, the nonmoving party. From April 2003 to March 19, 2004, Popoalii was incarcerated at the St. Charles County Department of Corrections ("St. Charles"). She began complaining of headaches in February 2004, for which she was eventually hospitalized at St. Joseph's Health Center ("St. Joseph's") where she was diagnosed with viral encephalitis. On March 19, 2004, Popoalii was transferred from St. Charles to the WERDCC. While incarcerated at the WERDCC, Popoalii developed permanent blindness from complications of a condition known as cryptococcal meningitis.

Cryptococcal meningitis is an uncommon fungal infection, primarily associated with HIV positive and immuno-compromised individuals. While at the WERDCC, Popoalii was not HIV positive and had no known risk factors associated with the infection. Permanent blindness is a rare complication of this infection.

---

[1]The Honorable Nanette K. Laughrey, United States District Judge for the Western District of Missouri.

-2-

The cause of Popoalii's infection remains unknown. Her medical experts have opined that she never had viral encephalitis, which was the diagnosis she received before her transfer to the WERDCC. Her experts did not offer testimony as to specific acts by defendants that fell beneath a standard of care. Her experts did state that, generally, earlier treatment may have prevented her blindness, but they could not say with any degree of medical certainty that particular failures or delays in care or any delays in obtaining her medical records caused Popoalii's blindness.

A. *Popoalii's Treatment by Correctional Staff at WERDCC*

When Popoalii first arrived at the WERDCC, she was processed through the receiving and orientation unit. During intake, she gave her medical history and underwent a brief evaluation by medical personnel. MDOC officers play no role in the medical evaluation nor do they gather medical records. Popoalii complained of headaches upon arrival, and MDOC defendant Scott Neagles instructed her to go to sick call—a once daily opportunity for inmates to be seen by medical staff.

During a subsequent educational screening with MDOC defendant Rebecca Patterson, Popoalii told Patterson that her head hurt so badly that she could not answer questions and that she just wanted to lie down. Patterson told Popoalii that she did not have permission for a "lay-in" (which allows a prisoner to stay in bed except for meals). Popoalii responded by telling Patterson just to take her to administrative segregation (otherwise known as "the hole") so that she could lay down. Patterson called a nurse and obtained permission to continue with the educational testing.

Patterson also called MDOC defendant Renee Samm who came to talk to Popoalii about her headache complaint. Popoalii told Samm that her head hurt and that she just wanted to lie down. Samm called the receiving and orientation unit to inform them of Popoalii's headache complaint, but was told Popoalii had just been in the medical unit and had not received a lay-in. Popoalii continued to complain about headaches and that she could not continue the test—she repeated that she just wanted

to go to "the hole" so that she could lie down. Samm wrote Popoalii a conduct citation. Popoalii was interviewed a few days later by MDOC defendant Bruce Sharp about this conduct violation. Popoalii did not offer any statement about the incident nor did she specifically request medical attention at that time.

On March 22, 2004, three days after her arrival at the WERDCC, Popoalii was placed in administrative segregation by order of MDOC defendant Mark Trusty. Trusty did not speak with or see Popoalii but ordered her moved to administrative segregation based on Sharp's interview. Prior to being placed in administrative segregation, Popoalii had been seen by medical staff twice since her arrival.

Two days later, Popoalii screamed from severe back pain. MDOC defendant Christina Hancock called the medical unit and spoke to an unidentified nurse practitioner who told Hancock that there was nothing wrong with Popoalii. On March 31, 2004, during head count, Hancock ordered Popoalii to sit up so she could be counted. Popoalii responded that she could not sit up because her head hurt too much. Popoalii also began to hallucinate. Popoalii eventually complied, but she was issued a conduct violation for the delay. She was interviewed by MDOC defendant Stephen Taylor for this conduct violation, but Popoalii again made no statement during the interview. Neither Popoalii nor Taylor remember whether she asked for medical attention.

That same day, MDOC defendant Mary Ann White conducted a disciplinary action hearing regarding Popoalii's conduct violations. White asked Popoalii over the intercom if she wanted to participate, and Popoalii responded that she did not.

On April 1, 2004, medical staff decided to transfer Popoalii from administrative segregation to the transitional care unit (TCU).[2] At that time, Popoalii first reported that she could not see and that her head continued to hurt. MDOC officers were on duty in the TCU for security reasons but were not allowed to provide medical care to inmates. MDOC officers also are not told why an inmate is in the TCU.

Often over the next few days, Popoalii screamed loudly. MDOC defendants Linda Rose, Thomas Dunn, and James Wilder told her to stop because she was disturbing other patients. Popoalii spilled her food and was told that if she did not clean it up and stop screaming, she would be returned to administrative segregation. Popoalii stated that she could not see her food at that time.

During this period of frequent screaming, Popoalii received several more conduct violations. One violation was read to Popoalii by MDOC defendant Colin Nichols who asked Popoalii to sign the citation. Popoalii stated that she wanted to sign the document, but she could not see it and that she had not been able to see for two days. MDOC defendant Neagles interviewed Popoalii about another conduct violation, and Popoalii told Neagles she could not see the violation well enough to sign it. On April 3, 2004, Popoalii was sent back to administrative segregation for these conduct violations by the order of MDOC defendant William Vallier. Vallier never saw Popoalii before issuing the transfer order. Popoalii was cleared for transfer by one of the nurses in the TCU.

The day after she was transferred back to administrative segregation, Neagles saw Popoalii hitting her head on the wall of her cell, stumbling around and falling on her bed. He notified his supervisor and the mental health unit by filling out a suicide

---

[2]The Transitional Care Unit is located within the medical unit at the WERDCC. In the TCU inmates can be under constant medical observation. Inmates are also placed in the TCU in order to receive diagnostic testing.

intervention form. He also called the medical unit to report the head banging. Popoalii was moved to a padded cell in the mental health unit and placed on full suicide watch.[3]

On April 6, 2004, Popoalii was transferred from the padded cell back to the TCU. She was subsequently taken to the emergency room at Audrain Medical Center. At the hospital she was diagnosed for the first time with cryptococcal meningitis and was eventually transferred to the University of Missouri Health Center.[4]

B. *Popoalii's Medical Care at WERDCC*

During intake at the WERDCC in mid-March, Popoalii reported her medical history to CMS defendant nurse Earl Cox, including her recent hospitalization for viral encephalitis. Popoalii told another unidentified nurse that she could not see. Cox visited Popoalii again a short while later when she complained of head pain. She told Cox that she had a constant headache due to the encephalitis. Cox evaluated her vital signs, which were normal, and gave her a lay-in restriction, which allowed her to stay in bed at all times except during medical care and meals. Cox also told her to report to sick call for further evaluation. Popoalii spoke to an unidentified nurse who gave her ibuprofen for her headache, which she continued to receive regularly during her stay at WERDCC.

The next day CMS defendant nurse Marilyn Meyer saw Popoalii due to her severe headache. Meyer assessed Popoalii's vital signs as within normal limits and examined Popoalii's pupils to verify that they were equal and reactive to light. Meyer

---

[3]MDOC defendant Alan Ham was listed as the shift supervisor on the suicide intervention form that Neagles filled out, but non-party MDOC officer Ruby Tyler was actually on duty and Ham had no involvement.

[4]While Popoalii was in the hospital, MDOC defendant Lisa Schoneboom participated in two disciplinary actions involving Popoalii. MDOC defendants Karen Morris and George Foster never had contact with Popoalii.

found Popoalii to be alert, oriented and balanced. Meyer noted that Popoalii was uncomfortable, and she instructed Popoalii to report to sick call for further care.

CMS defendant nurse practitioner Wendy Hull saw Popoalii on March 21, 2004, for a severe headache. Popoalii told her that she had been previously hospitalized for viral meningitis, which was causing her headaches. Hull assessed Popoalii's vital signs as within normal limits and provided her with a 24 hour lay-in. Hull saw Popoalii again on April 1, 2004, when Popoalii was admitted to the TCU for evaluation and observation. Hull evaluated Popoalii, as is required, before Popoalii was transferred out of TCU back to administrative segregation. Popoalii complained of a headache and Hull gave her ibuprofen, but because Popoalii's vital signs were normal Hull deemed Popoalii medically fit for a transfer to administrative segregation. April 4, 2004, after Popoalii was moved to a padded cell, Hull again evaluated her. Popoalii told Hull that she could not see, and Hull performed eye reflex tests and checked whether her eyes were equal and reactive to light. Hull also tested Popoalii's neurological function and vital signs. Hull remained with Popoalii for an hour to observe her, during this time Popoalii's condition did not change or decline.

CMS defendant nurse Debbie Welch saw Popoalii for complaints of a headache on the morning of March 22, 2004. Popoalii told Welch that she had been recently discharged from the hospital with viral meningitis (as opposed to encephalitis). Welch took her vitals, checked that her pupils were equal and reactive to light, checked that her smile was equal on both sides and that she could grip, push and pull. Welch saw that Popoalii was uncomfortable and contacted CMS defendant Dr. Sripatt Kulkanthorn to request a course of medical treatment. Dr. Kulkanthorn prescribed ibuprofen, which Welch administered.

CMS defendant nurse Carrie Oliver evaluated Popoalii on March 22, 2004, after Popoalii complained of a severe headache. Popoalii told Oliver that she had recently had viral meningitis, and Oliver had Popoalii sign a release to obtain prior medical

records. Oliver also called defendant Dr. Raymond Bloomquist to come evaluate Popoalii. Dr. Bloomquist evaluated Popoalii's neck and found it was flexible. Popoalii was responsive, coherent, and her vital signs were stable. Dr. Bloomquist ordered ibuprofen for Popoalii's pain. Dr. Bloomquist does not recall being aware of her reported history of encephalitis or meningitis, or that she was sensitive to light. According to Dr. Bloomquist, had he known of the light sensitivity in conjunction with a history of encephalitis, it would have been a "red flag."

CMS defendant Dr. Kulkanthorn met Popoalii first on March 22, 2004, when Welch consulted him about Popoalii's headaches. Dr. Kulkanthorn prescribed ibuprofen. On April 1, 2004, Dr. Kulkanthorn saw Popoalii again for a scheduled appointment regarding her headaches, and she reported head pain and said that she had not been able to see for a couple of days. She reported a history of headaches and a recent diagnosis of viral encephalitis. Dr. Kulkanthorn examined her head, neck, and eyes. Her neurological exam was normal, and he placed Popoalii in the TCU for observation. Dr. Kulkanthorn encouraged more fluid intake and ordered a blood count; he prescribed ibuprofen and a shot of Visteril (for the headache), and he ordered her to lie flat and to be placed on fall precaution because of her visual problems.

On April 1, 2004, Popoalii was placed in a room for observation by CMS defendant nurse Teresa Vanlandingham who assessed her skin, eyes, and vital signs as normal. CMS defendant nurse Vicki Dixon observed Popoalii during the early morning of both April 1 and 2, 2004, and she assessed Popoalii's vital signs, neurological signs, eyes and facial movements as normal. Dixon did note that Popoalii began making noises and picking at things in the air. Dixon refused a request from Popoalii for pain medication once because it was not time to administer the medication, and Dixon did not have permission to give extra medicine.

Dr. Kulkanthorn saw Popoalii again on April 2, 2004, and she still complained of headaches but could walk normally and put her chin to her chest. Her eye movement and neurological function were normal. Dr. Kulkanthorn attributed her headaches to her previously diagnosed encephalitis, poor vision, and depression. Dr. Kulkanthorn reviewed Popoalii's medical records that her mother had faxed to the WERDCC sometime on or before April 2, and he saw her encephalitis diagnosis and negative CT scan. He obtained results of new blood work and liver and thyroid tests. He ordered that Popoalii remain in the TCU, but despite his order she was removed to administrative segregation on April 3 by MDOC staff. On April 5th, when Dr. Kulkanthorn discovered Popoalii had been removed to administrative segregation, he ordered that she be returned back to the TCU. When Popoalii told Dr. Kulkanthorn that she could not see any light, he requested a consultation with an ophthalmologist. On April 6th, the opthalmologist evaluated Popoalii's complaints and recommended an immediate MRI. Popoalii was taken to a hospital for an MRI and CT scan and was then correctly diagnosed with cryptococcal meningitis.

## C. *Motions to Amend the Complaint*

In April 2005, Popoalii filed this § 1983 suit alleging that the defendants were deliberately indifferent to her serious medical needs in violation of her Eighth Amendment rights. Pursuant to the district court's scheduling order, any motion to amend the pleadings was to be filed on or before January 31, 2006. Discovery closed September 1, 2006.

Popoalii first requested to file an amended complaint on June 23, 2006, which was five months after the deadline for amending the pleadings. Popoalii's motion stated that she wanted to add additional counts and to add and dismiss some defendants. Popoalii's counsel argued Popoalii's illness had prevented identification of all proper claims and defendants. This motion did not include a copy of the proposed amended complaint. The district court denied this motion on June 28, 2006.

About a month later, on July 24, 2006, Popoalii again requested to amend her complaint. The new motion to amend attached a proposed amended complaint to the motion as required by Rule 15 of the Federal Rules of Civil Procedure Rule. The proposed amended complaint removed several defendants and added a negligence claim against CMS and its employees. The district court held a teleconference on July 27, 2006, to discuss this second motion to amend. During this teleconference, the defendants objected to the amended complaint based on the timing of the amendment and the nature of the changes. The defendants argued that they would be unfairly prejudiced by an amendment so close to the discovery deadline. The district court informed Popoalii that it would grant the motion provided that Popoalii agreed to reimburse certain defense costs and fees. Popoalii's counsel declined this offer, and the court denied Popoalii's motion.

## D. *Expert Affidavit*

The district court's scheduling order also required disclosure of expert witnesses by July 3, 2006. Popoalii timely disclosed Dr. Jerold Dreyer. Dr. Dreyer filed his expert report on June 30, 2006. In this report, consisting of a three paragraph letter, Dr. Dreyer opined that despite her earlier diagnosis, Popoalii never had viral meningitis, and that "there was no significant effort on the part of the correctional institute to ascertain her prior medical diagnosis and condition. This resulted in the lack of appropriate care and led to the blindness of Ms. Popoalii."

During his deposition Dr. Dreyer testified that his June 30th letter accurately and completely summarized his opinions in this case and that he had not prepared any other reports. He also testified that he had no specific criticisms of the defendants' actions. Further, Dr. Dreyer acknowledged that even with appropriate treatment a patient with cryptococcal meningitis may nonetheless develop blindness. He testified that there were two ways cryptococcal meningitis could lead to blindness—intracranial pressure or a direct fungal invasion of the optic nerve. Dr. Dreyer stated that only if blindness is caused by intracranial pressure could relieving

that pressure reduce the chances of blindness. Dr. Dreyer would not state an opinion as to whether Popoalii's blindness was caused by intracranial pressure or fungus—he indicated that his expertise did not extend to identifying the specific cause of her blindness and declined to speculate.

Popoalii's response to defendants' summary judgment motion included an additional affidavit from Dr. Dreyer stating:

> c. The defendant's failure to immediately obtain and review Plaintiff's medical records hampered their ability to adequately assess and treat Plaintiff's condition in that the defendants—specifically the treating nurses and physicians at the correctional facility—could not know which of Plaintiff's body systems to test and monitor, and that they therefore did not know how to properly treat Plaintiff. In particular, the defendants failed to test and monitor Plaintiff's intracranial pressure prior to April 8, 2004, and that appropriate testing/monitoring thereof could have likely prevented Plaintiff's blindness.
>
> d. Had the defendants obtained and reviewed Plaintiff's medical records, it is more likely than not that the defendants would have been able to plan a course of appropriate treatment such that Plaintiff could have avoided blindness as a complication of her condition . . . .

The court granted defendants' motion to strike this additional affidavit because the defendants had not had a chance to depose Dr. Dreyer on these opinions and Popoalii would not be prejudiced by striking the affidavit.

## II. *Discussion*

Popoalii appeals, arguing that the district court erred in: (1) denying her motion to amend the complaint; (2) granting the defendants' motion to strike Dr. Dreyer's expert affidavit; and (3) granting summary judgment on Popoalii's Eighth Amendment claim. We address Popoalii's arguments in that order.

A. *Motion to Amend the Complaint*

Popoalii first alleges that the district court abused its discretion by denying her motions to amend the complaint. A district court should freely give leave to a party to amend its pleadings when justice so requires, Fed. R. Civ. P. 15(a); however, it may properly deny a party's motion to amend its complaint when such amendment would unduly prejudice the non-moving party or would be futile. *Kozohorsky v. Harmon*, 332 F.3d 1141, 1144 (8th Cir. 2003).

A decision whether to allow a party to amend her complaint is left to the sound discretion of the district court and should be overruled only if there is an abuse of discretion. *Bell v. Allstate Life Ins. Co.*, 160 F.3d 452, 454 (8th Cir. 1998). A court abuses its discretion when it denies a motion to amend a complaint unless there exists undue delay, bad faith, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment. *Id*. When late tendered amendments involve new theories of recovery and impose additional discovery requirements, appellate courts are less likely to hold a district court abused its discretion. *Id.* If a party files for leave to amend outside of the court's scheduling order, the party must show cause to modify the schedule. Fed. R. Civ. P. 16(b).

Popoalii filed two motions to amend her complaint. The first, filed on June 23, 2006, was submitted to the court approximately five months after the date set by the court in its scheduling order for amendment of the pleadings—January 31, 2006. Popoalii's motion did not include a copy of the proposed amended complaint, and the motion did not state persuasive reasons for the delay in filing. Under Federal Rule of Civil Procedure 16(b), Popoalii needed to show cause in order to be given leave to amend. We have held, also, that granting leave to amend a complaint where the plaintiff has not submitted a proposed amendment is inappropriate. *Wolgin v. Simon*, 722 F.2d 389, 394 (8th Cir. 1983). Therefore, the district court did not abuse its discretion in denying leave to amend Popoalii's June 23, 2006, complaint.

Popoalii filed a second motion to amend her complaint on July 24, 2006, and this time she did attach a copy of the amended complaint. The changes included removing several defendants and adding a negligence count against some of the medical defendants. This motion, however, came six months after the date designated in the court's scheduling order. Popoalii's motion alleged that she decided to add a negligence count only after extensive discovery; however, if Popoalii had sufficient facts to plead deliberate indifference, she likely had sufficient facts to allege negligence because a showing of deliberate indifference is greater than negligence. *Pietrafeso v. Lawrence County, S.D.*, 452 F.3d 978, 983 (8th Cir. 2006). Discovery was scheduled to end approximately one month after this filing and had been ongoing since the fall of 2005.

In a teleconference with the court three days after this second motion was filed, the defendants told the court that the addition of a negligence count would prejudice them in that they would have to redo much of the discovery that had already been completed, including depositions of the parties. During this call, the district court informed Popoalii that it would grant Popoalii's motion to amend provided that Popoalii agreed to reimburse the defendant's likely increases in defense costs and fees. Popoalii's counsel declined this offer.

The district court had discretion to require Popoalii to compensate the opposing parties for any losses caused by granting a motion to amend. *Bell*, 160 F.3d at 455. The district court did not abuse its discretion in denying the motion to amend given the potential prejudice to defendants that would result from the late addition of a new claim proposed after most of the discovery had been completed. Therefore, we affirm the district court's denial of both the June 23, 2006 and July 24, 2006 motions to amend the complaint.

## B. *Striking of Expert Affidavit*

Next, Popoalii argues that the district court erred in striking the affidavit of Dr. Dreyer. We review the district court's rulings on admission of expert opinion testimony for abuse of discretion. *Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 635 (8th Cir. 2007); *Dow Corning Corp. v. Safety National Cas. Corp.*, 335 F.3d 742, 751–52 (8th Cir. 2003).

Popoalii timely disclosed Dr. Dreyer as an expert witness, and his report was submitted on June 30, 2006. Dr. Dreyer was deposed about his opinions, and he stated that the report completely and accurately summarized his opinions concerning Popoalii's medical care. After the close of discovery, Popoalii filed an additional affidavit from Dr. Dreyer. This second affidavit accompanied Popoalii's response to defendants' motion for summary judgment. The district court struck this second expert affidavit because the defendants had no opportunity to depose Dr. Dreyer on these new opinions before close of discovery. Further, the court noted that because Popoalii represented that the affidavit contained nothing new, she would not be prejudiced by its exclusion.

Generally, a court is required to consider an otherwise admissible affidavit, unless that affidavit contradicts previous deposition testimony. *Webb v. Garelick Mfg. Co.*, 94 F.3d 484, 488 (8th Cir. 1996). If an additional affidavit simply restates information already contained in deposition testimony or elaborates on information already conveyed, then the district court should consider the affidavit. *Id.* Contradictory supplemental affidavits are a different matter. We have held that "[i]f testimony under oath . . . can be abandoned many months later by the filing of an affidavit, probably no cases would be appropriate for summary judgment. A party should not be allowed to create issues of credibility by contradicting his own earlier testimony." *Camfield Tires, Inc. v. Michelin Tire Corp.*, 719 F.2d 1361, 1365 (8th Cir. 1983). Post-deposition contradictory affidavits are admitted only when the prior

deposition testimony shows confusion, and the subsequent affidavit helps explain the contradiction. *Cuffley v. Mickes*, 208 F.3d 702, 707 (8th Cir. 2000).

Popoalii contends that Dr. Dreyer's second affidavit merely elaborated on the information contained in his initial report and deposition and, therefore, should have been admitted as non-contradictory supplemental information. In his initial report, Dr. Dreyer opined that the defendants' failure to seek Popoalii's medical records "resulted in the lack of appropriate care and led to the blindness of Ms. Popoalii." Dr. Dreyer, however, acknowledged that Popoalii's medical records did not contain a diagnosis of her actual condition. Dr. Dreyer testified that he had no specific criticisms of the defendants' medical treatment. He also testified that there were two ways cryptococcal meningitis could lead to blindness—either by the swelling of the brain and increased cranial pressure or by a direct fungal invasion of the optic nerve—and only if Popoalii's blindness was caused by intracranial pressure would relieving the pressure have reduced the chances of blindness. He would not opine whether Popoalii's blindness was caused by intracranial pressure or fungal infection of the optic nerve. He also stated that a patient could develop blindness even if they received treatment.

In his post-discovery affidavit, Dr. Dreyer did not assert that he was clarifying his initial report and deposition. The second affidavit, unlike his initial report, opined that if the defendants had tested and monitored Popoalii's intracranial pressure, they could have likely prevented her blindness. Dr. Dreyer's second affidavit thus conflict's with his initial opinion. He initially stated he did not know whether intracranial pressure or fungus caused Popoalii's blindness; however, Dr. Dreyer's post-discovery affidavit opines that if the defendants had treated Popoalii's intracranial pressure they likely could have prevented her blindness. Therefore, because Dr. Dreyer's affidavit is not merely supplemental but is actually inconsistent with his previous testimony, we cannot say that the district court abused its discretion in striking the affidavit.

-15-

## C. *Eighth Amendment Deliberate Indifference*

Finally, Popoalii alleges that defendants acted with deliberate indifference to her serious medical needs, and the district court consequently erred in granting summary judgment for the defendants. We review a grant of summary judgment de novo. *Smith v. Clarke*, 458 F.3d 720, 723 (8th Cir. 2006). Summary judgment is appropriate if the record, when viewed in the light most favorable to the nonmoving party, reveals that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986).

A prison official's deliberate indifference to a prisoner's serious medical needs constitutes cruel and unusual punishment in violation of the Eighth Amendment. *Alberson v. Norris*, 458 F.3d 762, 765–66 (8th Cir. 2006). A prima facie case alleging deliberate indifference requires the inmate-plaintiff to demonstrate that she suffered from an objectively serious medical need and the "prison officials actually knew of but deliberately disregarded" that need. *Id.* Medical malpractice alone, however, is not actionable under the Eighth Amendment. *Smith*, 458 F.3d at 724. For a claim of deliberate indifference, "the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Estate of Rosenberg v. Crandell*, 56 F.3d 35, 37 (8th Cir. 1995). Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct. *Olson v. Bloomberg*, 339 F.3d 730, 736 (8th Cir. 2003).

A serious medical need is "one that is so obvious that even a layperson would easily recognize the necessity for a doctor's attention." *Vaughn v. Greene County, Ark.*, 438 F.3d 845, 851 (8th Cir. 2006). Cryptococcal meningitis unquestionably is a serious medical condition. We focus, then, on whether Popoalii presented evidence that defendants knew of and disregarded her cryptococcal meningitis. We agree with

the district court that Popoalii has not produced any evidence to show that the defendants were more than grossly negligent. In light of the facts described above, we affirm the district court. Although Popoalii's situation is truly tragic, the facts in the record do not rise to the level of deliberate indifference.

Popoalii emphasizes that although the CMS defendants asked for her medical records on March 22, 2004, they were not received until possibly April 2, 2004. But, even if the CMS defendants had received Popoalii's medical records sooner, they would only have been informed of a diagnosis that would not have put them on notice of Popoalii's actual condition. Popoalii had none of the normal signs or risk factors of cryptococcal meningitis—she was not HIV positive or immuno-compromised—and cryptococcal meningitis is difficult to diagnose. Although CMS defendants could, and probably should, have been more vigilant in obtaining Popoalii's medical records, they did ask for and eventually obtain those inaccurate records. Defendants' actions with regard to Popoalii's medical records, while regrettable, do not constitute deliberate indifference.

Popoalii also argues that defendants acted with deliberate indifference when sending her to administrative segregation from the TCU and when issuing conduct citations. Before sending Popoalii to administrative segregation, MDOC defendants received approval from CMS defendants that Popoalii was healthy enough for the transfer, and CMS defendants checked Popoalii's vital signs, as was standard procedure, before giving approval. It is indeed regrettable that Popoalii received conduct citations and was put on suicide watch, not for actual misconduct, but for behavior arising from meningitis-caused hallucinations and blindness. However, the factual record is without genuine dispute, and the record simply does not reflect that CMS defendants knew Popoalii's behavior was a result of a serious medical condition. The record also does not show Popoalii's conduct citations impeded the medical care that she did receive, however ineffective it proved to be. Viewing the record in the

light most favorable to Popoalii, the record does not show that Popoalii's Eighth Amendment rights were violated.

### III. *Conclusion*

For the reasons stated above, we affirm the judgment of the district court.

_____