# United States Court of Appeals

## For the Eighth Circuit

_____

No. 11-2552

_____

Brian D. Hartis; Jacqueline H. Hartis

*Plaintiffs - Appellants*

v.

Chicago Title Insurance Company

*Defendant - Appellee*

_____

Appeal from United States District Court
for the Western District of Missouri - Kansas City

_____

Submitted: June 14, 2012
Filed: September 12, 2012

_____

Before SMITH, BEAM, and SHEPHERD, Circuit Judges.

_____

SMITH, Circuit Judge.

Brian D. Hartis and Jacqueline H. Hartis (collectively, "the Hartises") appeal from the district court's[1] denial of their motion to remand their suit against Chicago Title Insurance Company ("Chicago Title") to state court. They argue that the district

_____

[1]The Honorable Dean Whipple, United States District Judge for the Western District of Missouri.

court erroneously determined that the amount in controversy exceeds $5 million under the Class Action Fairness Act (CAFA). In the alternative, the Hartises argue that the district court abused its discretion in denying their motion for leave to amend their complaint to assert a punitive-damages claim. Finally, they contend that the district court erred in dismissing their claims as moot. We affirm.

## I. *Background*
### A. *Hartises' Petition for Individual and Class-Action Relief*

The Hartises, individually and on behalf of the putative class, filed suit in Missouri state court against Chicago Title, "alleging that Chicago Title failed to reimburse numerous customers for excess money collected at real estate closings for recording fees." *Hartis v. Chi. Title Ins. Co.*, 656 F.3d 778, 779 (8th Cir. 2009) (per curiam). In ¶¶ 6 and 7 of their petition, the Hartises "alleged . . . that Chicago Title retained $24 in excess recording fees charges related to the purchase of their home in Kansas City, Missouri, representing a $3 overcharge on one transaction and a $21 overcharge on a second transaction." *Id*. Paragraph 8 of the petition alleged that

> [j]ust as they did in the financings involving the Hartises, Chicago [Title] provides disbursement and escrow services in other real estate closings and financings, including collecting and possessing recording fees in escrow and disbursing and paying recording fees to the relevant governmental entity. In those other transactions a specific amount of money is entrusted to Chicago [Title] for the sole and specific purpose of possessing that money to pay fees charged to record documents in connection with the transaction. In many of those transactions, Chicago [Title], just as it did in the Hartises' transactions, is entrusted with more money than is ultimately charged by or paid by Chicago [Title] to the governmental entity with whom documents are recorded. Just as it did in the financings involving the Hartises, Chicago [Title] keeps for itself that amount of money which belongs to other individuals and entities and which was held in trust by Chicago [Title] to be paid for recording fees only but which exceeded the amount of recording fees actually charged to record documents and actually paid by Chicago [Title] to

record documents. That money belongs to the individuals or entities who paid it for a sole and specific purpose, yet Chicago [Title] continues to possess that money.

In ¶ 11 of the petition, the Hartises alleged that "Chicago [Title] collected a recording fee from Missouri residents alone over a five[-]year period on more than 71,000 transactions." They also claimed that, "[a]part from Missouri, Chicago [Title] acts as an escrow and disbursement agent in connection with real estate closings in sixteen other states and the District of Columbia."

According to ¶ 12 of the petition,

[e]ach member of the class will have in common the following with one another and with the Hartises: what amount was entrusted to Chicago [Title] to be disbursed for recording fees, what was paid for recording fees, did Chicago [Title] retain possession of over[-]collected recording fees. The Hartises and each member will have the same relationship with Chicago [Title] and each class members['] damages will be calculated in the identical fashion. The legal theory of the Hartises and each class member is identical and based on the same conduct. These common questions of law and fact predominate over any questions affecting only individual class members.

As to typicality, the Hartises alleged in ¶ 13 of the petition that their "claims are essentially identical, and therefor[e] typical of, the claims of each other class member in that they are based on identical relationship with Chicago [Title] and identical conduct of Chicago [Title] in each transaction and are based on the same legal theory."

"The petition asserted a claim for conversion and sought money damages for the class members that was 'fair and reasonable,' reasonable attorneys' fees and expenses, and other relief." *Hartis*, 656 F.3d at 779.

-3-

B. *Chicago Title's Removal and the Hartises' Motion to Remand*

"Chicago Title filed a timely notice of removal, invoking 28 U.S.C. §§ 1332, 1441, 1446, and 1453." *Id*. Chicago Title contended in its notice of removal

> that it is deducible from the face of the petition that the amount in controversy exceeds $5 million. Chicago Title pointed to the petition's contention that Chicago Title collected a recording fee from Missouri residents alone on more than 71,000 transactions over a five-year period. Chicago Title reasoned that, due to the volume of transactions that it has conducted in just one state over a five-year period and the fact that the proposed class, as outlined in the petition, includes potential members in 17 states and the District of Columbia, the amount in controversy clearly exceeds $5 million. Chicago Title provided the district court with an affidavit from Janet E. Ellis, Senior Vice President and Chief Technology Officer of Fidelity National Management Services, in which Ellis stated that she provides information technology support services to Chicago Title and that, based on the information available to her in her professional capacity, Chicago Title collected recording fees in approximately 2,235,000 transactions during the five-year period between 2002 and 2006. Chicago Title suggested that if the class representatives' overcharges ($12 on average per transaction) are typical of the putative class, and if the district court looked at either 71,000, the transaction quantity figure presented by the class representatives for a five-year period in Missouri, or 2,235,000, the national figure presented in the Ellis affidavit, the $5 million jurisdictional minimum is clearly exceeded.

*Id*. at 780.

Following Chicago Title's notice of removal, the Hartises "moved to remand to state court, asserting that the district court lacked subject matter jurisdiction because a preponderance of the evidence does not indicate that the amount in controversy exceeds $5 million." *Id*. Specifically, they argued "that Chicago Title's jurisdictional argument, as it stands, which is based on the number of transactions in

-4-

which an overcharge could have occurred rather than on actual evidence of overcharges, is insufficient." *Id*. According to the Hartises, "in order to meet its burden, Chicago Title must provide extensive evidence of specific overcharges sufficient to prove up the $5 million threshold." *Id*.

The district court denied the Hartises' motion to remand. "In its first determination of jurisdiction," the court concluded that the CAFA jurisdictional amount of $5 million was satisfied "'[b]ased on the damages alleged in [the Hartises'] petition, the size of the potential class in this case, [the Hartises'] allegation that Chicago Title over-collected in many of its transactions, and the information provided by [Chicago Title] in the Ellis affidavit.'" *Id*. (quoting Appellants' Addendum at 4). "Later in its order, when discussing whether or not the jurisdictional threshold would be reached if Chicago Title's transactions in only 12 states were considered . . . , the court did include 'the potential for collection of significant attorneys fees' as a factor in determining that . . . the $5 million threshold was met." *Id*. at 780–81 (quoting Appellants' Addendum at 4–5).

C. *Appeal of Denial of Motion to Remand*

The Hartises appealed the district court's denial of their motion to remand, arguing, *inter alia*, that "the district court erred in relying on attorneys' fees to find that the requisite amount in controversy was met because only *statutory* attorneys' fees can be counted towards the jurisdictional amount and they sought no statutory fees in their state court petition." *Id*. at 781.

Because "[i]t [was] unclear to us whether or not the district court included an amount for attorneys' fees in its calculation of the jurisdictional amount," we "remand[ed] to the district court for a redetermination of whether Chicago Title ha[d] proven, by a preponderance of the evidence, that the amount in controversy is satisfied." *Id*. at 782.

-5-

We did "not address the [Hartises'] . . . argument that the record before the district court was insufficient to support the conclusion that it is more likely than not that the amount in controversy exceeds $5 million" because of our remand to the district court regarding its "possible erroneous inclusion of the [Hartises'] claim for 'reasonable attorneys' fees.'" *Id*. at 782 n.1.

## D. *Second Denial of Motion to Remand*

On remand, the district court concluded that "after omitting from its consideration [the Hartises'] claim for reasonable attorneys' fees, . . . Chicago Title has proven by a preponderance of the evidence that the amount in controversy in this case exceeds $5 million." The court reached this conclusion "after considering the damages alleged in [the Hartises'] petition, the size of the potential class in this case, [the Hartises'] allegation that Chicago Title over-collected in many of its transactions, and the information provided by [Chicago Title] in the Ellis affidavit." In support of its determination, the court cited the Hartises' allegations that (1) "the . . . class included potential members in seventeen states and the District of Columbia" and (2) "Chicago Title collected a recording fee from Missouri residents alone on more than 71,000 transactions over a five-year period." It also cited the Ellis affidavit's statement that "Chicago Title collected recording fees in approximately 2,235,000 transactions during the five[-]year period between 2002 and 2006." The court accepted Chicago Title's argument that

> if [the Hartises'] overcharges ($12 on average per transaction) are typical of the putative class, and the Court looks at either 71,000, the transaction quantity figure presented by [the Hartises] for a five[-]year period in Missouri, or 2,235,000, the national figure presented in the Ellis affidavit, the $5 million jurisdiction minimum is clearly exceeded.

The district court "disagree[d]" with the Hartises' argument that "in order to meet its burden, Chicago Title must provide extensive evidence of specific overcharges sufficient to prove up the $5 million threshold" rather than relying "on

-6-

the number of transactions in which an overcharge could have occurred." The court found that "an analysis of [the Hartises'] petition and [Chicago Title's] affidavit suggests the number of potential claims is still conservatively in the multiple hundreds of thousands, if not millions." According to the court, "[t]he large number of transactions in controversy and the facts alleged in [the Hartises'] petition indicate that a fact finder might legally conclude that the damages in this case are more than $5 million, irrespective of how many states are ultimately represented in the class." (Footnote omitted.)

This court subsequently denied the Hartises' application for permission to immediately appeal the district court's denial of their motion to remand.

### E. *Scheduling Order and Denial of Class Certification*
On January 26, 2009, the district court entered a scheduling order, which included the following requirements:

1. Discovery shall be limited to discovery relating to issues concerning the certification of the proposed class. Class certification discovery shall close on October 23, 2009.

* * *

3. Motions to join additional parties shall be filed no later than February 27, 2009.

4. Motions to amend the pleadings shall be filed no later than February 27, 2009.

* * *

10. Disclosure of Expert Testimony. Any party who intends to call an expert relevant to class certification issues shall disclose all expert testimony relevant to class certification issues no later than

August 3, 2009. Any party who intends to file expert testimony opposing any such expert shall disclose the same no later than September 14, 2009. The parties shall file their expert disclosures with the Court pursuant to Federal Rule of Civil Procedure 26(a)(4) and Local Rule 26.4(2).

The schedules fixed herein will not be extended except for good cause shown and upon further written order of the Court.

The Hartises did not object to or move to change the dates set forth in the scheduling order.

Approximately seven months later, Chicago Title moved to deny class certification, and the Hartises opposed that motion and moved for class certification. The district court ultimately denied class certification but concluded that it still had jurisdiction over the case and need not remand the case to the state court.

F. *First Motion to Dismiss for Lack of Jurisdiction*

After the district court denied class certification, Chicago Title offered to pay the Hartises' full damages and costs of suit pursuant to Federal Rule of Civil Procedure 68. Chicago Title tendered $181.20, which was the Hartises' alleged over-collection plus the filing fees for their lawsuit. In making the tender, Chicago Title stated, "If you believe that this amount is not a complete return of all monies allegedly owed your clients, or of all the costs of their suit, please provide a[n] itemized account of the asserted shortfall as soon as possible." The Hartises rejected Chicago Title's offer.

On October 26, 2010, Chicago Title moved to dismiss for lack of subject matter jurisdiction on the ground that the Hartises' claims were moot in light of Chicago

-8-

Title's tender.[2] The court concluded that it still had subject matter jurisdiction over the action, finding that "a plaintiff's claim should not be dismissed because of a defendant's tender if the plaintiff is forced to pay over the tendered amount to counsel for costs and fees, thus leaving him with no recovery." In the present case, the court determined that even if the Hartises accepted Chicago Title's tender, "they would have received no recovery" because "[u]nder the retention agreement between [the Hartises] and their counsel, any money recovered by the [Hartises] is paid to their attorneys to cover the expenses of the case until those expenses are paid in full. [The Hartises'] counsel has advanced expenses in excess of $9,000 and [Chicago Title's] tender was for $181.20."

G. *Motion to Amend and Second Motion to Dismiss*

On March 29, 2011, the Hartises sought leave to amend their complaint to add a claim for punitive damages. In response, Chicago Title argued that the court should deny the Hartises' motion because of undue delay, as the deadline to file motions to amend was February 27, 2009. The Hartises replied that the February 27, 2009 deadline did not apply because that deadline only related to motions to amend concerning the issue of class certification. They contended that the court never set a deadline to file motions to amend that related to the merits of the case, meaning that their motion to amend was timely.

On April 1, 2011, Chicago Title filed its second motion to dismiss for lack of subject matter jurisdiction, explaining that it made another "offer of judgment which provides [the Hartises] with all they claim to be entitled to, as well as the costs and expenses that they are obligated to reimburse to their attorneys."

---

[2]Chicago Title also moved in the alternative for summary judgment, which the district court denied because it found "that genuine issues of material fact remaine[d] in dispute."

On June 14, 2011, the district court denied the Hartises' motion to amend and granted Chicago Title's motion to dismiss. First, as to the Hartises' motion to amend, the court agreed with Chicago Title that the February 27, 2009 deadline applied to *all* motions to amend the pleadings, as "the [c]ourt clearly stated in paragraphs one and ten that the discovery deadline and expert designation deadline only related to the class certification issue. The [c]ourt did not make similar qualifications in paragraphs three and four related to motions to join additional parties and to amend the pleadings." As a result, the court found that "the February 27, 2009 deadline for filing motions to amend the pleadings does apply and is relevant to [the Hartises'] current motion to amend before the [c]ourt."

The Hartises argued "that they did not assert a claim for punitive damages earlier in the litigation because they thought that asserting such a claim would be cause for the [c]ourt to deny class certification." But the court noted that it denied class certification on September 20, 2010, yet the Hartises "waited over six months to seek leave to add this claim for punitive damages." The court found that this reflected a lack of diligence and concluded that the Hartises failed to show good cause as to why they should be permitted to amend the complaint out of time to assert a claim for punitive damages.

Second, the court addressed Chicago Title's second motion to dismiss. Chicago Title had tendered a new offer to the Hartises, which they did not accept. Chicago Title argued that the Hartises' "claims [were] moot because [it] ha[d] made an offer of judgment that satisfie[d] [the Hartises'] entire demand." Unlike Chicago Title's prior offer, "this offer allow[ed] for [the Hartises] to receive recovery by accounting for the money that they must pay over to their counsel under the retention agreement." The new offer of judgment awarded the Hartises the greater of

> (i) the total amount of Ten Thousand Dollars ($10,000,00 [sic]) or (ii)
> $24, plus interest, plus costs and expenses (excluding attorney's fees

-10-

which are not recoverable) that may be taxed by the Court for [the Hartises'] individual and class-related claims. The amount set forth in (ii) in the immediately preceding sentence includes the amount of the claimed over-collection ($24), Missouri statutory interest ($9.90), the amounts identified in [the Hartises'] affidavit: filing fee to Jackson County ($105); fee for the service of summons ($110); filing fee to the Western District for filing a Notice of Appeal ($455), and all recoverable costs (excluding attorney's fees which may not be awarded as costs) awarded by the Court.

The court agreed with Chicago Title that this offer of judgment mooted the Hartises' claims, finding that the Rule 68 offer was valid and "an amount equivalent to or greater than the amount that the [Hartises] could conceivably have obtained by going to trial." The court determined that "this offer account[ed] for the money that [the Hartises] must pay counsel for expenses incurred as required by the retention agreement." Therefore, the court found that the offer mooted the Hartises' claims and stated that "[j]udgment for [the Hartises] in accordance with [Chicago Title's] Rule 68 offer of judgment will be entered."

The June 15, 2011 judgment provided that "[the Hartises'] Motion for Leave to File Amended Complaint . . . is DENIED and [Chicago Title's] Motion to Dismiss for Lack of Subject Matter Jurisdiction . . . is GRANTED."

## II. *Discussion*

On appeal, the Hartises argue that the district court lacked subject matter jurisdiction because Chicago Title failed to prove by a preponderance of the evidence that the amount in controversy exceeded CAFA's $5 million threshold; therefore, they assert that the district court erroneously denied their motion to remand to state court. In the alternative, they argue that the district court abused its discretion in denying their motion for leave to amend their complaint to assert a punitive-damages claim.

Finally, they contend that the district court erroneously dismissed their claims as moot.

A. *Amount in Controversy*

The Hartises argue that Chicago Title failed to satisfy its burden of proving by a preponderance of the evidence CAFA's $5 million amount-in-controversy requirement. According to the Hartises, Chicago Title "presented no proof of the estimate number of putative class members nor an estimate of an average amount of over[-]collected recording fees sustained by each putative class member." They maintain that Chicago Title could "readily obtain[]" such information. According to the Hartises, "[t]he district court speculated about the number of class members based on the total number of closing transactions in which [Chicago Title] acted as a settlement agent and speculated that the Hartises' two transactions . . . were 'typical' of the amount over[-]collected." Therefore, they conclude that the district court lacked subject matter jurisdiction over their case and erroneously denied their motion to remand to state court.

"We review de novo a district court's order to remand a removed case for lack of subject matter jurisdiction." *Bell v. Hershey Co.*, 557 F.3d 953, 956 (8th Cir. 2009).

"[A] party seeking to remove under CAFA must establish the amount in controversy by a preponderance of the evidence regardless of whether the complaint alleges an amount below the jurisdictional minimum." *Id*. at 958. "Under the preponderance standard, '[t]he jurisdictional fact . . . is not whether the damages *are* greater than the requisite amount, but whether a fact finder *might* legally conclude that they are . . . .'" *Id*. at 959 (quoting *Kopp v. Kopp*, 280 F.3d 883, 885 (8th Cir. 2002)) (alterations in original). Such an inquiry "is fact intensive." *Id*.

The removing party's "burden of describing how the controversy exceeds $5 million" constitutes "a pleading requirement, not a demand for proof. Discovery and

trial come later." *Spivey v. Vertrue, Inc.*, 528 F.3d 982, 986 (7th Cir. 2008). The removing party "need not 'confess liability in order to show that the controversy exceeds the threshold.'" *Id.* (quoting *Brill v. Countrywide Home Loans, Inc.*, 427 F.3d 446, 449 (7th Cir. 2005)).

> "[T]he removing party's burden is to show not only what the stakes of the litigation *could be*, but also what they *are* given the plaintiff's actual demands. . . .The demonstration concerns what the plaintiff is claiming (and thus the amount in controversy between the parties), not whether plaintiff is likely to win or be awarded everything he seeks."

*Id.* (quoting *Brill*, 427 F.3d at 449) (alterations in original).

We, like the district court, conclude that Chicago Title has proven by a preponderance of the evidence that the amount in controversy exceeds $5 million. The Hartises' petition alleged that Chicago Title over-collected money at real estate closings for recording fees. With regard to the Hartises, ¶¶ 6 and 7 of the petition alleged that Chicago Title overcharged $3 on one transaction and $21 on a second transaction—a total of $24. This results in an average overcharge of $12. Paragraph 12 of the petition provided that the Hartises and purported class members have *"in common . . .* what *amount* was entrusted to Chicago [Title] to be disbursed for recording fees, what was *paid* for recording fees, [and] did Chicago [Title] retain possession of over[-]collected recording fees." (Emphases added.) It also stated that the Hartises' and class members' "*damages* will be calculated in the *identical* fashion" and that the Hartises' and class members' "legal theory . . . is *identical* and based on the same *conduct*." (Emphases added.) And, ¶ 13 says that the Hartises' "claims are essentially *identical*, and therefor[e] *typical* of, the claims of each other class member in that they are based on *identical* relationship with Chicago [Title] and *identical* conduct of Chicago [Title] *in each transaction* and are based on the same legal theory." (Emphases added.) Taken together, these paragraphs suggest that $12—the

-13-

average of the Hartises' overcharges—is representative of the overcharges of the class.

Having determined that a $12 overcharge is representative of the class pursuant to the Hartises' complaint, we now look to the complaint to determine how many transactions are at issue. In ¶ 8, the Hartises claimed that "[i]n many" of the transactions in which "a specific amount of money is entrusted to Chicago [Title] for the . . . purpose of . . . pay[ing] fees charged to record documents in connection with the transaction," Chicago Title over-collected the fees, "just as it did in the Hartises' transactions." In turn, ¶ 11 of the petition alleges that "Chicago [Title] collected a recording fee *from Missouri residents alone* over a five[-]year period on more than *71,000 transactions*" and also "acts as an escrow and disbursement agent in connection with real estate closings in *sixteen other states* and the District of Columbia." (Emphases added.) If 71,000 transactions occurred in Missouri alone over a five-year period, and Chicago Title conducts real estate closings in 16 other states, then multiplying 71,000 (the number of transactions in Missouri alone during a five-year period) by 17 (the total number of states) yields 1,207,000 transactions over a five-year period.[3] Viewing ¶¶ 8 and 11 together, in "many" of these 1,207,000 transactions, Chicago Title over-collected recording fees. "Many" is defined as "consisting of or amounting to a *large* but indefinite number: *not few*." Webster's Third New International Dictionary 1379 (2002) (emphases added). Thus, a "large" number of Chicago Title's approximately 1,207,000 transactions in the 17 states purportedly involves over-collections in the amount of $12—the amount representative of the class. Even if we assume that a "large" number of these

---

[3]We know from the Ellis affidavit that Chicago Title actually "conducted approximately 2,235,000 transactions during the five[-]year period between 2002 and 2006"—1,028,000 transactions more than our estimate based on the Hartises' complaint. According to Chicago Title's brief, it "has direct operations in eighteen states plus Washington, D.C." Therefore, the figure of 2,235,000 transactions encompasses 18 states instead of 17 states, as set forth in the Hartises' petition.

transactions only equates to one-half—or 603,500 transactions—the jurisdictional amount is still easily satisfied. Multiplying 603,500 transactions by $12 yields $7,242,000.[4]

Therefore, looking at the face of the complaint alone, we hold that Chicago Title has satisfied its burden of proving the jurisdictional amount by a preponderance of the evidence.[5]

> To establish the jurisdictional amount, [we do not require that][Chicago Title] . . . concede liability for the entire amount [of transactions], which is what [the Hartises] [are] in essence demanding by effectively asking [Chicago Title] to admit that at least $5 million of the [the money that Chicago Title collected at real estate closings for recording fees in the 17 states were over-collections] within the meaning of the complaint.

*Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010). Instead, Chicago Title's burden of proof was to merely show by a preponderance of the evidence that "a fact finder *might* legally conclude that" "the damages *are* greater than the requisite

---

[4]Before the district court, the Hartises argued in their motion for remand "that the case is ostensibly limited to claimants in only twelve states" because, as the district court explained, they "exclude[d] members of the class certified in *Krause v. Chicago Title Insurance Company*, Case No. 0516-CV30246, Circuit of Jackson County[,] and members of the putative class in *Arevalo v. Fidelity National Financial, Inc.*, Case No. SA 06CA02650G, United States District Court for the Western District of Texas, from the present action." Even if we assume that only 12 states are involved, we still conclude that Chicago Title has satisfied its burden of proving that the amount in controversy exceeds $5 million. The substantial sum obtained by calculating damages for class plaintiffs in 12 versus 17 states still produces a potential recovery above $5 million.

[5]For this reason, we need not use the national figure presented in the Ellis affidavit of 2,235,000 transactions to calculate the amount in controversy.

amount." *Bell*, 557 F.3d at 959 (quotations and citations omitted). We conclude that it satisfied that burden.

"Once the removing party has established by a preponderance of the evidence that the jurisdictional minimum is satisfied, remand is only appropriate if the plaintiff can establish to a legal certainty that the claim is for less than the requisite amount." *Id*. at 956. Nowhere in the Hartises' briefs do they attempt to establish to a legal certainty that their claim is for less than the requisite amount.

Therefore, we affirm the district court's denial of the Hartises' motion to remand to state court.

## B. *Motion to Amend*

The Hartises also assert that the district court abused its discretion in denying them leave to amend their petition to assert a punitive-damages claim because the court's reason for denying their motion—delay alone—is not a valid reason under this court's precedent. According to the Hartises, the district court did not find—and Chicago Title did not present any evidence—that Chicago Title would be unfairly prejudiced if the district court permitted the Hartises to amend their petition to assert a punitive-damages claim.

Moreover, the Hartises argue that they "had good reason to believe they would be able to seek leave to amend their pleading after the district court ruled [on] their motion for class certification" because

> [t]he plain language of the January 26, 2009 scheduling order stated that it applied only to briefing on the Hartises' motion for class certification, and the parties were ordered to file a separate proposed scheduling order for the merits phase of the case no later than 30 days after the court's ruling on the motion for class certification.

According to the Hartises, the district court erroneously applied the February 27, 2009 deadline to motions to amend the pleadings to their individual claims because it "completely ignored the opening line of its January 26, 2009 Order[,] stating, 'The Court hereby enters the following scheduling order *for briefing on Plaintiff's Motion for Class Certification*.'" They also assert that this "order expressly provided that a subsequent scheduling order would be entered 'for the merits phase of this case.'"

In response, Chicago Title argues that the Hartises are essentially contending "that the district court misinterpreted its own scheduling order because . . . the order [purportedly] dealt only with class certification." Chicago Title maintains that the district court "plausibly read its own order to set a deadline for amending pleadings that was not limited to class-certification issues." Additionally, Chicago Title argues that "the sequence of events shows that the [Hartises] sought leave to amend only as a last-ditch tactic to avoid having the case resolved by Chicago Title's offer of judgment." Chicago Title asserts that the Hartises have "offere[d] no explanation, other than their own tactical gamesmanship, for why they could not have ple[aded] punitive damages in their original [p]etition."

"[W]e will defer to the [d]istrict [c]ourt's construction of its own order." *Brachtel v. Apfel*, 132 F.3d 417, 420 (8th Cir. 1997); *see also Steahr v. Apfel*, 151 F.3d 1124, 1126 (8th Cir. 1998) ("[W]e will defer to the district court's interpretation of its own remand order."). Here, the district court interpreted its scheduling order as setting a deadline of February 27, 2009, for motions to amend the pleadings, not just those pertaining to class-certification issues. The introductory sentence to the order states, "The Court hereby enters the following scheduling order for briefing on [the Hartises'] Motion for Class Certification." But the paragraphs that follow specify whether they pertain to class certification specifically. For example, ¶ 1 states that "[d]iscovery shall be limited to discovery relating to issues concerning the certification of the proposed class. Class certification discovery shall close on October 23, 2009." Similarly, ¶ 10 provides that "[a]ny party who intends to call an

-17-

expert relevant to class certification issues shall disclose all expert testimony relevant to class certification issues no later than August 3, 2009." By contrast, ¶ 3 and 4 omit any reference to "class certification" in stating the deadlines. Relevant to the present appeal, ¶ 4 states, "Motions to amend the pleadings shall be filed no later than February 27, 2009." This paragraph is not qualified by the phrase "class certification." Therefore, the district court could reasonably interpret its own order to mean that all motions to amend the pleadings—those related to class certification or not—were due on February 27, 2009.

The Hartises' motion to amend "implicated both Rule 15(a) and Rule 16(b)" of the Federal Rules of Civil Procedure. *Sherman v. Winco Fireworks, Inc.*, 532 F.3d 709, 715 (8th Cir. 2008).

> Rule 15(a) governs the pretrial amendment of pleadings and states that where an amendment is not sought "as a matter of course"—as defined by the Rule—"a party may amend its pleading only with the opposing party's written consent or the court's leave." Fed. R. Civ. P. 15(a)(2). The Rule provides that "[t]he court should freely give leave when justice so requires." *Id.* But parties do not have an absolute right to amend their pleadings, even under this liberal standard. *United States ex rel. Lee v. Fairview Health Sys.*, 413 F.3d 748, 749 (8th Cir. 2005). A district court appropriately denies the movant leave to amend if "there are compelling reasons such as undue delay, bad faith, or dilatory motive, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the non-moving party, or futility of the amendment." *Moses.com Sec., Inc. v. Comprehensive Software Sys., Inc.*, 406 F.3d 1052, 1065 (8th Cir. 2005) (internal marks omitted).

> Rule 16(b), on the other hand, guides the district court's issuance and modification of pretrial scheduling orders and provides that "[e]xcept in categories of actions exempted by local rule, the district judge . . . must issue a scheduling order," which "must limit the time to join other parties, amend the pleadings, complete discovery, and file motions." Fed. R. Civ. P. 16(b)(1), (3)(A). This schedule "may be

modified *only for good cause* and with the judge's consent." Fed. R. Civ. P. 16(b)(4) (emphasis added). In addition, Rule 16(d) states that a pretrial order "controls the course of the action unless the court modifies it."

*Id*. at 715 (alterations in original).

Our precedent establishes that "'[i]f a party files for leave to amend outside of the court's scheduling order, the party *must* show cause to modify the schedule.'" *Id*. at 716 (alterations in original) (quoting *Popoalii v. Corr. Med. Servs.*, 512 F.3d 488, 497 (8th Cir. 2008)). "Rule 16(b)'s good-cause standard governs when a party seeks leave to amend a pleading outside of the time period established by a scheduling order, not the more liberal standard of Rule 15(a)." *Id*. (citing *Popoalii*, 512 F.3d at 497). "Because [the Hartises] filed [their] motion to amend [their] complaint [25] months after the scheduling deadline for amending pleadings, '[u]nder [Rule] 16(b), [the Hartises] needed to show cause in order to be given leave to amend." *Id*. (fifth alteration in original) (quoting *Popoalii*, 512 F.3d at 497).

"'The primary measure of good cause is the movant's diligence in attempting to meet the order's requirements.'" *Id*. (quoting *Rahn v. Hawkins*, 464 F.3d 813, 822 (8th Cir. 2006)). We generally "will not consider prejudice [to the nonmovant] if the movant has not been diligent in meeting the scheduling order's deadlines." *Id*. at 717. Instead, we "focus in the first instance (and usually solely) on the diligence of the party who sought modification of the order." *Id*. Where there has been "no change in the law, no newly discovered facts, or any other changed circumstance . . . after the scheduling deadline for amending pleadings," then we may conclude that the moving party has failed to show good cause. *Id*. at 718.

Here, the Hartises were not "diligent" in seeking to amend their complaint. *See id*. at 716–17. The motion to amend came over two years after the scheduling order's

-19-

deadline. *See Freeman v. Busch*, 349 F.3d 582, 589 (8th Cir. 2003) (holding that district court did not abuse its discretion by denying plaintiff's motion to amend complaint to add punitive damages where motion was filed seven weeks before end of discovery but ten months after district court entered scheduling order and where plaintiff provided no reason why those damages could not have been alleged earlier and no good cause for late filing of motion to amend). Moreover, the Hartises have not alleged a change in the law, the discovery of new facts, or some other change in circumstances. *See Sherman*, 532 F.3d at 718 ("Here, no change in the law, no newly discovered facts, or any other changed circumstance made the preemption defense more viable after the scheduling deadline for amending pleadings."). Instead, they maintain that they did not assert a claim for punitive damages earlier in the litigation because they thought that asserting such a claim would result in the court denying class certification. This tactical decision is fully the Hartises' prerogative, but it hardly constitutes good cause for an extremely tardy pleading-amendment motion. Finally, as the district court noted, the Hartises waited over six months after the district court denied their motion for class certification to seek leave to add a claim for punitive damages. This is further evidence of the Hartises' lack of diligence. Accordingly, we hold that the district court did not abuse its discretion in denying the motion to amend.

## C. *Dismissal*

The Hartises' final argument depends on our treatment of their punitive-damages claim. They contend that if we permit their claim, then Chicago Title's $10,000 offer of judgment did not moot their claims. But, we have already determined that the district court did not abuse its discretion in denying the Hartises' motion to amend their petition to add a punitive-damages claim. Therefore, the Hartises alternatively argue that if we affirm the denial of their motion for leave to assert a claim for punitive damages, then we must nevertheless reverse the district court's June 15, 2011 judgment because the district court did not enter judgment in the Hartises' favor. We disagree.

-20-

In its June 14, 2011 order, the district court stated that "[j]udgment for [the Hartises] in accordance with [Chicago Title's] Rule 68 offer of judgment will be entered." The judgment entered on June 15, 2011 did not, however, enter judgment for the Hartises but instead granted Chicago Title's motion to dismiss the Hartises' claims for lack of subject matter jurisdiction—a clerical error. Therefore, the Hartises request that we reverse the dismissal of their claims and direct the district court to enter a judgment in the amount of $10,000.

"Judgment should be entered against a putative class representative on a defendant's offer of payment . . . where class certification has been properly denied and the offer satisfies the representative's entire demand for injuries and costs of the suit." *Alpern v. UtiliCorp. United, Inc.*, 84 F.3d 1525, 1539 (8th Cir. 1996). Here, the district court stated in its June 14, 2011 order that it would enter judgment in the Hartises' favor in accordance with Chicago Title's offer. *See O'Brien v. Ed Donnelly Enter., Inc.*, 575 F.3d 567, 575 (6th Cir. 2009) (asserting that instead of concluding "that a plaintiff loses outright when he refuses an offer of judgment that would satisfy his entire demand," "the better approach is to enter judgment in favor of the plaintiffs in accordance with the defendants' Rule 68 offer of judgment"). However, the district court's June 15, 2011 did not enter judgment in the Hartises' favor; instead, it granted Chicago Title's motion to dismiss.

Federal Rule of Civil Procedure 60(a) provides:

(a) Corrections Based on Clerical Mistakes; Oversights and Omissions. The court may correct a clerical mistake or a mistake arising from oversight or omission whenever one is found in a judgment, order, or other part of the record. The court may do so on motion or on its own, with or without notice. But after an appeal has been docketed in the appellate court and while it is pending, *such a mistake may be corrected only with the appellate court's leave*.

(Emphasis added.)

"The plain language of the rule divests the district court of jurisdiction to correct mistakes or omissions in its judgment while an appeal of such judgment is pending before the appellate court, unless leave of the appellate court has been granted." *In re Modern Textile, Inc.*, 900 F.2d 1184, 1193 (8th Cir. 1990). Rule 60(a)'s "purpose . . . is to protect the administrative integrity of the appeal, i.e., to ensure that the issues on appeal are not undermined or altered as a result of changes in the district court's judgment, unless such changes are made with the appellate court's knowledge and authorization." *Id*.

> [*A*]*fter* the appellate court has ruled on the appeal, the district court still has the power under Rule 60(a) to clarify and correct omissions in its judgment to reflect what the court originally intended, without leave of the appellate court, so long as the Court's corrections do not alter or amend anything expressly or implicitly ruled on by the appellate court.

*Id*. (quotation, alteration, and citation omitted).

Here, a clerical error does exist in the district court's June 15, 2011 judgment, as it does not match the June 14, 2011 order. But the Hartises have not moved under Rule 60(a) for the district court to correct the judgment or for this court to grant leave for the district court to correct the clerical error. As a result, we decline to "afford [the Hartises] with the specific relief sought." *Id*. But, following this appeal, the Hartises "may . . . [make a] Rule 60(a) motion for relief to the district court. At that time, the district court would have the power under Rule 60(a) to consider the propriety of making any requested corrections to its judgment." *Id*.

### III. *Conclusion*
Accordingly, we affirm the judgment of the district court.

_____