FILED
United States Court of Appeals
Tenth Circuit

December 20, 2016

Elisabeth A. Shumaker
Clerk of Court

**PUBLISH**

**UNITED STATES COURT OF APPEALS**

**TENTH CIRCUIT**

ELIZABETH HAMMOND,

　　　Plaintiff - Appellee,

v.

STAMPS.COM, INC.,

　　　Defendant - Appellant.

No. 16-2243

**Appeal from the United States District Court
for the District of New Mexico
(D.C. No. 1:15-cv-00605-JCH-SCY)**

Seth E. Pierce of Mitchell Silberberg & Knupp, LLP, Los Angeles, California
(Gilbert S. Lee of Mitchell Silberberg & Knupp, LLP, Los Angeles, California,
and Andrew G. Schultz of Rodey, Dickason, Sloan, Akin & Robb, P.A.,
Albuquerque, New Mexico, with him on the briefs), for Defendant-Appellant.

Sid Childress, Sante Fe, New Mexico, for Plaintiff-Appellee.

Before **KELLY**, **GORSUCH**, and **McHUGH**, Circuit Judges.

**GORSUCH**, Circuit Judge.

　　The Class Action Fairness Act promises a federal forum for proposed class

actions if (among other things) the amount "in controversy" exceeds $5 million.

28 U.S.C. § 1332(d)(2). But though it has made appearances in many and even

pretty ancient federal jurisdictional statutes, the term "in controversy" remains a source of dispute for the parties before us and gives rise to this appeal. Affording the phrase its traditional meaning, we find federal jurisdiction here beyond doubt.

The case comes to us this way. In exchange for a monthly subscription fee, Stamps.com lets customers print their own postage from home, saving them a trip to a post office or the purchase of a self-metering device. But Ms. Hammond says Stamps.com's website disclosures didn't clearly explain its monthly subscription charges. She says she thought that Stamps.com would charge her only for those months when she actually used its service, not every single month. The representations on Stamps.com's website, she alleges, were misleading and amounted to an unlawful trade practice. Claiming that "many members of the general public" were similarly deceived, Ms. Hammond seeks to pursue a class action in New Mexico state court on behalf of everyone in the country who, like her, called to cancel their subscriptions after "discovering" that Stamps.com "was taking money from them" every month. Ms. Hammond alleges that this class includes "hundreds or thousands of persons." And while she doesn't allege a total damages amount, she contends that she is entitled to $300 in statutory damages and that other members of the proposed class should "likely" receive damages of $31.98, representing two monthly subscription charges ($15.99 x 2), based on her estimate of how long customers could have reasonably failed to notice the

monthly charges before calling to cancel. Ms. Hammond also seeks punitive damages for herself and other class members.

Unsurprisingly, Stamps.com sought to remove the case to federal court. The company presented uncontested declarations showing that in the last four years (corresponding to a likely statute of limitations period) at least 312,680 customers called to cancel their subscriptions. The company observed that, if each of these persons were to win the same $300 in damages Ms. Hammond seeks for herself, the value of this case would exceed $93 million. And even if other class members could secure only $31.98 in damages, the company noted, the case's potential value would still lie at almost $10 million. Well above the $5 million threshold Congress ordained.

All the same, the district court refused jurisdiction. It held that Stamps.com failed to meet its burden of showing that over $5 million was "in controversy." The reason? The court faulted Stamps.com for failing to disaggregate from the total number of customer cancellations those customers who "felt duped" by Stamps.com's website disclosures. As the district court noted, customers could have cancelled their accounts because of "any of a myriad of . . . reasons." Not everyone was deceived. Put more pointedly, without proof from Stamps.com establishing how many of its customers were actually deceived, the district court thought the company couldn't satisfy the $5 million "in controversy" requirement.

This conclusion rests on a legal error about the meaning of a key statutory term. In using the phrase "in controversy" CAFA borrowed a term heavily encrusted with meaning. A term that's long appeared in our federal diversity statute and, indeed, traces its lineage all the way back to the Federal Judiciary Act of 1789, if not beyond. *See* An Act to Establish the Judicial Courts of the United States, ch. 20, 1 Stat. 73, 78 (1789) (codified as amended at 28 U.S.C. § 1332(a)); Thomas E. Baker, *The History and Tradition of the Amount in Controversy Requirement: A Proposal to "Up the Ante" in Diversity Jurisdiction*, 102 F.R.D. 299, 302-03 (1984). When Congress chooses to employ a term of legal art like this we typically assume it is employing its accepted meaning. As Justice Frankfurter put it, "if a word is obviously transplanted from another legal source, whether the common law or other legislation, it brings the old soil with it." Felix Frankfurter, *Some Reflections on the Reading of Statutes*, 47 Colum. L. Rev. 527, 537 (1947); *see also* Antonin Scalia & Bryan A. Garner, *Reading Law* 73 (2012).

That old soil reveals much here. As historically used, the term "in controversy" has never required a party seeking to invoke federal jurisdiction to show that damages "*are* greater" or will *likely* prove greater "than the requisite amount" specified by statute. *Hartis v. Chi. Title Ins. Co.*, 694 F.3d 935, 944 (8th Cir. 2012). Instead, the term has required a party seeking federal jurisdiction to show only and much more modestly that "a fact finder *might* legally conclude" that damages exceed the statutory amount. *Id.* As the Supreme Court has

- 4 -

explained, to justify dismissal under this standard "it must appear to a legal certainty that the claim is really for less than the jurisdictional amount." *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283, 289 (1938). And this court has repeatedly "caution[ed] counsel and courts" against pursuing any other understanding or test. *Frederick v. Hartford Underwriters Ins. Co.*, 683 F.3d 1242, 1248 n.4 (10th Cir. 2012); *see also McPhail v. Deere & Co.*, 529 F.3d 947, 955 (10th Cir. 2008); *Gibson v. Jeffers*, 478 F.2d 216, 220 (10th Cir. 1973); 14AA Charles Alan Wright et al., Federal Practice and Procedure § 3702, at 306-08 (4th ed. 2011). Of course, all these expositions about the meaning of the term "in controversy" have come in the course of interpreting earlier federal jurisdictional statutes and it is at least conceivable Congress could have meant something different in CAFA. Our presumption of consistent usage is just that, a presumption. But we cannot think of — and the parties do not even attempt to give us — any reason to suppose that in using the term "in controversy" Congress in CAFA meant anything at odds with our traditional understanding.

To know that much is to know how our case must come out. Applying the traditional understanding of the term "in controversy" to the undisputed facts before us yields no doubt: federal jurisdiction exists here as a matter of law. After all and by everyone's admission, actual damages run at least $31.98 and perhaps $300 per person (before punitive damages). And, as everyone acknowledges, at least 312,000 people cancelled their subscriptions during the

class period.  All this leads to the possibility that a jury might lawfully award relief between nearly $10 million and $93 million.  A legal possibility that is more than enough to trigger federal jurisdiction.

The district court employed a different and mistaken understanding of the statutory term.  It effectively required Stamps.com to prove that a factfinder *would* (or *probably* would) find damages in excess of the statutory amount.  In reaching its decision to deny jurisdiction, the district court emphasized that it's *unlikely* Ms. Hammond will be able to show all 312,000 customers cancelled their accounts because of the company's alleged misrepresentations.  For our part, we don't doubt that probabilistic judgment for a moment.  The problem is that it answers the wrong question.  For the question at this stage in the proceedings isn't what damages the plaintiff will *likely* prove but what a factfinder *might* conceivably lawfully award.  And on that question — the only legally salient question before us — no one has identified any legal impediment precluding a jury from finding all 312,000 persons entitled to relief.  At the end of the day, "[e]ven if it is highly improbable that the Plaintiffs will recover the amounts Defendants have put into controversy, this does not meet the legally impossible standard." *Raskas v. Johnson & Johnson*, 719 F.3d 884, 888 (8th Cir. 2013). (And though it's beside the point, it is perhaps noteworthy that even Ms. Hammond's own probabilistic estimate about the likely outcome in this case appears at odds with the district court's, for she has volunteered her belief that

maybe half of the 312,000 customers will ultimately prove entitled to recovery —

an estimate that would yield damages of between $4.98 million and $46 million

before punitive damages, and no one disputes punitive damages could exceed

$20,000.)

Usually history offers its lessons for good reason and our case supplies no

exception. For the law's traditional course here is not some empty formalism.

The jurisdictional test history suggests serves a useful purpose, helping to keep

cases from bogging down in mini-trials before they've even begun. At this stage,

we're just trying to decide the forum for the dispute, not liability or damages.

And a more aggressive inquiry into the likelihood of success on the merits would

invite delays and costs more appropriately reserved for adjudicating the merits

than choosing the forum. Such an inquiry would, as well, force the proponent of

jurisdiction to argue against himself, tasking him with the job of proving his own

likely liability in a sufficient number of individual cases simply to get a foot in

the door of the federal courthouse. A result awfully unlikely on its face, one

made all the more so when (again) we're unaware of any other arena in which the

term "in controversy" has been interpreted to exact such a heavy price for federal

jurisdiction. *See Raskas*, 719 F.3d at 888 (concluding that a party should not be

forced to concede liability to win jurisdiction); *Hartis*, 694 F.3d at 944-46 (same);

*Lewis v. Verizon Commc'ns, Inc.*, 627 F.3d 395, 400 (9th Cir. 2010) (same);

*Spivey v. Verture, Inc.*, 528 F.3d 982, 986 (7th Cir. 2008) (same).

Neither do Ms. Hammond's rejoinders persuade us. She suggests that any error here was merely factual, not legal, so our review should be more deferential. But we do not question any fact found by the district court. For that matter and again, we agree with the district court's probabilistic judgment that it is very unlikely all 312,000 persons who cancelled service during the relevant period will prove entitled to damages in the end. We acknowledge, too, that in its recitation of the applicable legal standards the district court cited the correct legal test for jurisdiction (focusing on what's legally possible, not what's likely). The problem is that in applying the law to the facts the court proceeded to employ a more demanding test than the law allows, mistakenly focusing not on the *legally possible* but the *factually probable*. And that is an error of law we are not free to disregard.

Alternatively, Ms. Hammond suggests we should wait. Once the class is certified and the number of class members is readily apparent, she says, we'll all have a better idea of the number of individuals who relied on the company's alleged misrepresentations. So Stamps.com can and should simply proceed in state court until that point and then remove the case to federal court. But in adopting CAFA, Congress didn't say that a federal forum should await class certification or trial or some mini-trial concerning likely success on the merits (something Congress certainly could have done if it wished: consider the preliminary injunction context). To the contrary, Congress expressly provided

that it's enough to establish that over $5 million is "in controversy." It provided, too, that parties wanting to remove cases to federal court generally must do so within 30 days after service of the complaint. 28 U.S.C. § 1446(b)(1). And if a district court (as here) remands the case to state court, Congress granted the party pursuing federal jurisdiction the right to an immediate appeal and a decision on the merits of that appeal within 60 days. 28 U.S.C. § 1453(c)(1)-(2). So it is that Congress chose a particular term and developed a comprehensive statutory scheme that consistently bespeaks a wish to resolve the forum question early and quickly in the litigation. For a court to delay a statutory entitlement to a federal forum without legal justification is no more defensible than for a court to deny that entitlement without legal justification. Our job is to abide Congress's policy directions, not replace them with others of our own hand.

Holding for Ms. Hammond in this case would place us at odds not just with the language and structure of the statute but with the considered judgment of many other circuits. Already several courts have held as we do today, explaining that federal jurisdiction under CAFA doesn't depend on how much the plaintiff is likely to recover but on the amount the plaintiff's allegations suggest she might lawfully recover. And neither, again, are we given any reason to doubt the collective wisdom of our colleagues. It is our judgment, as it was theirs, that "[o]nce the proponent of federal jurisdiction has explained plausibly how the stakes exceed $5 million . . . the case belongs in federal court unless it is legally

impossible for the plaintiff to recover that much." *Spivey*, 528 F.3d at 986; *see also Raskas*, 719 F.3d at 887-88; *Hartis*, 694 F.3d at 944-46; *Lewis*, 627 F.3d at 400-02.

The remand order is vacated and the case is remanded for further proceedings consistent with this opinion.