W&W Partners, Inc. v. Ferrell Land Co., LLC, 2019 NCBC 44.

| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| WAKE COUNTY | 17-CVS-9998 |

W&W PARTNERS, INC. and CHASE
PROPERTIES, INC.,

          Plaintiffs,

v.

FERRELL LAND COMPANY, LLC;
FERRELL INVESTMENTS LIMITED
PARTNERSHIP; DAVID S. FERRELL;
and LUANNE FERRELL ADAMS,

          Defendants.

**ORDER AND OPINION ON CROSS-MOTIONS FOR SUMMARY JUDGMENT**

THIS MATTER comes before the Court on Plaintiffs' Motion for Summary Judgment ("Plaintiffs' Motion", ECF No. 88), and Defendants' Motion for Summary Judgment as to Plaintiffs' First, Fifth, and Seventh Claims and Ferrell Land Company, LLC's Counterclaims ("Defendants' Motion", ECF No. 86) (together, the "Summary Judgment Motions").

THE COURT, having considered the Summary Judgment Motions, the evidentiary materials[1] and briefs filed in support of and in opposition to the Summary

---

[1] The Court notes that Plaintiffs did not meet the letter or spirit of Business Court Rule ("BCR") 7.5 in filing their supporting materials. BCR 7.5 provides that "Materials that have been filed previously need not be re-filed, but the filing party should use specific references to the docket location of the previously filed materials to aid the Court. In selecting materials to be filed, parties should attempt to limit the use of voluminous materials." In support of Plaintiffs' Motion, Plaintiff filed a document entitled "Index and Notice of Designation of Materials in Support of Plaintiffs' Motion for Summary Judgment (Public Filing). (ECF No. 90.) This document was a single .pdf that consisted of over 3,400 pages, contained 184 separate exhibits, and included what appeared to be the entire deposition transcripts for many of the deposed witnesses though only a limited number of pages of testimony were referenced. The exhibits were not separately filed as sub-documents to the index, meaning the entire 3,400 pages had to download from the docket before single exhibits could be viewed. In addition, Plaintiffs did not cite to a majority of those 184 exhibits in their briefs and,

Judgment Motions, the arguments of counsel at the hearing, and other appropriate matters of record, CONCLUDES, that the Plaintiffs' Motion should be DENIED, and the Defendants' Motion should be GRANTED, in part, and DENIED, in part, in the manner and for the reasons set forth below.

*George B. Currin for Plaintiffs W&W Partners, Inc. and Chase Properties, Inc.*

*K&L Gates LLP, by A. Lee Hogewood III, Margaret R. Westbrook, and Matthew T. Houston, for Defendants Ferrell Land Company, LLC; Ferrell Investments Limited Partnership; David S. Ferrell; and Luanne Ferrell Adams.*

McGuire, Judge.

## I. FACTUAL AND PROCEDURAL BACKGROUND

1. The Court does not make findings of fact when ruling on motions for summary judgment. *See In re Estate of Pope*, 192 N.C. App. 321, 329, 666 S.E.2d 140, 147 (2008) (citation omitted). The factual background contained herein, taken from the evidence submitted in support of and in opposition to the Motion, is intended solely to provide context for the Court's analysis and ruling.

---

instead, often relied upon documents filed in connection with Plaintiffs' Motion for Leave to Amend the Second Amended Complaint, (ECF No. 91), further expanding the scope of the record.

Additionally, Plaintiffs have included the Management Agreement in this electronic record a total of ten (10) times. Plaintiffs' single .pdf document contained six (6) separate copies of the Management Agreement, (ECF No. 90 at Exs. D2, E1, F1, G1, I3, K5), when it had already been included in this record as an attachment to the original complaint, (ECF No. 3), the first amended complaint, (ECF No. 9), the second amended complaint, (ECF No. 13), and the affidavit of B. Kyle Ward, (ECF No. 21).

The filing of exhibits in this fashion makes its extraordinarily difficult and time consuming for the Court to navigate the record. The Court asks that counsel be cognizant of their role in creating a helpful and manageable record.

2.     Plaintiff W&W Partners, Inc. ("W&W") is a real estate development company. Plaintiff Chase Properties, Inc. ("Chase") is a real estate broker or agent. Collectively, W&W and Chase are referred to herein as "Plaintiffs."

3.     Defendant Ferrell Land Company, LLC ("FLC") is a limited liability company formed on December 14, 1995, and is in the business of land development. Former Defendants David S. Ferrell ("David"), Luanne Ferrell Adams ("Luanne")[2], and their now-deceased father, Omer Ferrell ("Omer"), were the original managing members of FLC. David and Luanne are the current managing members of FLC.

4.     On May 13, 1998, David, Luanne, and other Ferrell family relatives formed Defendant Ferrell Investments Limited Partnership ("Ferrell Investments"), a landholding and investment company. (D. Ferrell Aff., ECF No. 87.2, at ¶ 11.) David and Luanne are general and limited partners of Ferrell Investments. (*Id.* at ¶ 16.) FLC and Ferrell Investments are separate entities: neither has equity in or manages the other company, and the two companies conduct separate businesses. (*Id.* at ¶¶ 12–16.)

5.     On January 1, 1996, Plaintiffs and FLC entered into a Management, Development and Exclusive Agency Agreement. (Verif. Second Am. Compl., ECF No. 13 at Ex. A (hereinafter "the Management Agreement" or the "Agreement").) Ferrell Investments was not a party to the Management Agreement. The Management Agreement provides that FLC "intends to acquire, develop, and market the real property described in Exhibit A [to the Management Agreement] ('Land') as lots for

_____

[2] All claims alleged against David and Luanne were dismissed by Order. (ECF No. 65.)

residential, commercial, office and retail development." (*Id*. at p. 1.) Exhibit A to the Management Agreement is a map or plat showing the specific real property subject to the Agreement (hereinafter, the real property depicted in Exhibit A to the Management Agreement will be referred to as the "Land"). FLC is identified as the "Owner" in the Management Agreement, but when the parties executed the Agreement FLC did not actually own any of the Land. (ECF No. 87.2, at ¶ 26.) However, much of the property was owned by Omer, Omer's estate, and third parties. (*Id*.) The developed Land was to be known as "the Carpenter Village Planned Unit Development" (hereinafter the developed Land will be referred to as "the Development"). (ECF No. 13, at ¶ 9.)

6.     In the Management Agreement, W&W agreed to develop the real property, including "obtaining entitlements, permitting, zoning, rezoning, site plan approval, and other customer development tasks[.]" (*Id*. at ¶ 10.) Chase agreed to market and sell the property. (*Id*.) The Management Agreement provided that Plaintiffs would be compensated for their services as follows:

(a) FLC agreed to pay W&W a "Construction Management Fee" on a monthly basis equal to 5% of the "hard costs" of the improvement to the real property. Hard costs are defined as

> the Foreman Cost and the costs of installation of all Improvements including, but not limited to, curbs, gutters, streets, sidewalks, water, sanitary and storm sewers, entrances (including signs, landscaping and other beautification), common area improvements and amenities including the Recreation Center. Specifically included are the following: architectural, engineering and planning

costs, permits and licenses and application fees directly related to the Project.

(*Id.* at Ex. A, pp. 10–11);

(b) FLC agreed to compensate Chase by payment of a brokerage fee of either 5% of the "sales price of all Residential Land," and a brokerage fee of 6% on "the sales price of all Commercial Property," "upon the sale and closing of such property." (*Id.* at p. 11); and

(c) FLC agreed to pay W&W "[a]s compensation for [W&W]'s overall services to be provided hereunder, . . . 20% of the net profits of the Project." (*Id.* at p. 11.)

7.     The property was to be developed parcel-by-parcel in 19 "Phases." (ECF No. 13, at ¶ 11.) The parties prepared and attached to the Management Agreement pro forma "Project Expense" statements estimating the projected costs for development, marketing, and sale for each of the 19 Phases. (Pro Forma Statements, ECF No. 13, at Ex. C.)

8.     As part of the Management Agreement, W&W and its individual owners agreed to certain restrictions on their right to develop and manage property within two miles of the boundary line of the Land. Specifically, they agreed to refrain from developing or managing "any real property that is to be developed as a 'Neo traditional' subdivision within the area located within a two (2) mile radius of the boundary lines of the Land without the prior written consent of Owner, which may be granted or withheld at the sole discretion of Owner." (ECF No. 13 at Ex. A, p. 9.)

9. Shortly after execution of the Management Agreement, FLC instructed W&W to commence the rezoning and development of the Land, and W&W did so. (D. Ferrell Depo., ECF No. 90 at Ex. G, pp. 23–25.) FLC subsequently acquired, over a number of years, the parcels for Phases 1–17, and portions of Phases 18 and 19. (ECF No. 13, at ¶ 12.) Pursuant to the Management Agreement, Plaintiffs developed, marketed, and sold Phases 1–17, and the acquired portions of Phases 18 and 19. FLC did not acquire the remaining portions of Phases 18 and 19. (*Id*. at ¶¶ 23–24.) Hereinafter, the portions of Phases 18 and 19 that FLC did not acquire are referred to as "the Disputed Property." David lived on the Disputed Property at the time the Management Agreement was executed. (ECF No. 13, at ¶ 30.)

10. On or around July 2, 1998, Betty Lou Ferrell, wife to Omer and mother to David and Luanne, transferred the Disputed Property to Ferrell Investments. (ECF No. 90 at Ex. G, pp. 252–55.) It is unclear whether Ferrell Investments made any payment to Betty Lou Ferrell for the Disputed Property. (*Id*.)

11. In March 2002, David asked Plaintiffs to enter into an amendment of the Management Agreement to explicitly exclude the Disputed Property from the Land. (ECF No. 13, at ¶ 31; ECF No. 13 at Ex. E (hereinafter the "Proposed Amendment").) The Proposed Amendment changed the definition of the "Land" in the Management Agreement to state as follows:

> The term Land shall <u>not</u> include any of the 'Excluded Land' identified on Exhibit A or any other property not expressly listed on Exhibit A. Any property not included herein which may in the future be identified, considered or purchased for incorporation into the Carpenter Village PUD shall not be subject to the terms of this Agreement unless expressly added to this Agreement by written amendment executed by both parties.

(ECF No. 13 at Ex. E, p. 2 (emphasis in original).) The Proposed Amendment defined "Excluded Land" as "[a]ny property now owned by [Ferrell Investments] on the north side of Morrisville-Carpenter Road . . . [and] certain property under contract with Wake County School Board owned by [David] and [Luanne] and [Ferrell Investments][.]" (*Id.* at p. 21.) Plaintiffs refused to agree to the Proposed Amendment. (ECF No. 13, at ¶ 31.)

12. On July 3, 2003, the parties entered into an amendment to the Management Agreement. (ECF No. 13, at Ex. B (hereinafter, "the Amendment").) The Amendment, which was purportedly to "clarify the terms of the [Management] Agreement," provided that FLC "shall acquire" a discreet part of the Land described in the Management Agreement; set the acquisition cost for that part of the land for purposes of calculating W&W's share of the net profits; and provided that "except as expressly amended . . . the [Management] Agreement is hereby reaffirmed in all regards." (ECF No. 13, at Ex. B.) The Amendment did not change the definition of the Land.

13. In December 2016, Plaintiffs learned that Ferrell Investments had entered into a contract to sell the Disputed Property to a third-party. (ECF No. 13, at ¶ 32.) Plaintiffs demanded that FLC acquire the Disputed Property from Ferrell

Investments, but to date FLC has refused. (*Id.* at ¶ 40.) Plaintiffs allege that FLC breached the Management Agreement by refusing to acquire the Disputed Property. (*Id.* at ¶¶ 45–46.) Defendants also refused to permit Plaintiffs to participate in the development, marketing, or sale of the Disputed Property. (*Id.* at ¶ 41.)

14. Plaintiffs allege that "David [ ] and Luanne [ ], as managers of [FLC] and partners of [Ferrell Investments] are refusing to perform [FLC]'s obligations [under the Management Agreement] in order to personally realize a higher profit from the sale of [the Disputed Property] and to deprive [W&W] and Chase of the benefit of their bargain under the [Management Agreement]." (*Id.* at ¶ 42.) FLC contends that the Management Agreement does not obligate FLC to acquire any of the Land, including the Disputed Property, but only provides that if FLC acquires any or all of the Land, Plaintiffs shall have the right to develop, market, and sell such property. (ECF No. 87, at p. 10.)

15. On August 18, 2017, Plaintiffs filed their Complaint in this action. (ECF No. 3.) Plaintiffs subsequently filed an Amended Complaint on September 29, 2017, (ECF No. 9), and a verified[3] Second Amended Complaint on October 27, 2017. (ECF No. 13.) The Second Amended Complaint alleges claims for: breach of contract against FLC for failure to acquire the Disputed Property ("First Cause of Action") (*Id.* at ¶¶ 43–47); specific performance against all Defendants ("Second Cause of Action") (*Id.* at ¶¶ 48–52); piercing the corporate veil against all Defendants ("Third Cause of Action") (*Id.* at ¶¶ 53–61); unfair and deceptive trade practices against all Defendants

---

[3] Plaintiffs filed verification of the SAC on February 12, 2018. (ECF No. 48.)

("Fourth Cause of Action") (*Id.* at ¶¶ 62–65); constructive trust against Ferrell Investments ("Fifth Cause of Action") (*Id.* at ¶¶ 66–68); breach of listing agreement contained in the Master Agreement against FLC and David ("Sixth Cause of Action") (*Id.* at ¶¶ 69–78); and breach of contract against FLC for failure to pay W&W the "net profits" as calculated by the Management Agreement ("Seventh Cause of Action") (*Id.* at ¶¶ 79–84).

16. On December 29, 2017, Plaintiffs filed a Motion for Preliminary Injunction. (ECF No. 20.) On March 8, 2018 the Court denied Plaintiffs' Motion for Preliminary Injunction. (Order on Pls.' Mot. for PI, ECF No. 61.)

17. FLC brought counterclaims for breach of the Management Agreement for W&W's failure to comply with essential terms; breach of the implied covenant of good faith and fair dealing; and for attorneys' fees. (Defs.' Answ. and CC, ECF No. 25.) FLC subsequently voluntarily dismissed its claims for breach of the Agreement and breach of the implied covenant of good faith and fair dealing. (ECF No. 120.) FLC's only remaining counterclaim is for attorneys' fees.

18. On December 29, 2017, Defendants filed a Motion to Dismiss Claims One through Five and Seven of Plaintiffs' Second Amended Complaint ("Motion to Dismiss"). (ECF No. 23.) In the Motion to Dismiss, Defendants sought, *inter alia*, dismissal of Plaintiffs' claim that FLC breached the Management Agreement by failing to acquire the Land (First Cause of Action). (*Id.*) On May 22, 2018 the Court entered an Order and Opinion on Defendants' Motion to Dismiss the Second Amended Complaint ("SAC"). ("Order on Motion to Dismiss", ECF No. 65; *W & W Partners, Inc.*

*v. Ferrell Land Co., LLC*, 2018 NCBC LEXIS 52 (N.C. Super. Ct. May 22, 2018).) Regarding Plaintiffs' First Cause of Action the Court concluded "that the Management Agreement does not unambiguously establish that FLC was not obligated to acquire the Land, including the Disputed Property, for development and sale by Plaintiffs" and denied Defendants' motion to dismiss the First Cause of Action for breach of contract. *Id.* at *20–21. In the Order on Motion to Dismiss, the Court dismissed Plaintiffs' claims for specific performance (Second Cause of Action), piercing the corporate veil (Third Cause of Action), and unfair and deceptive trade practices (Fourth Cause of Action).

19.     Plaintiffs subsequently voluntarily dismissed their claims for breach of the listing agreement (Sixth Cause of Action) and breach of contract as it applied to unpaid portions of the net profits from the sale of Phases 1 through 17 and portions of Phases 18 and 19 (Seventh Cause of Action). (ECF No. 119.)   Following the dismissals, Plaintiffs' only claims remaining for disposition are the claims for breach of contract for failure to acquire the Disputed Property (First Cause of Action) and for constructive trust (Fifth Cause of Action).

20.     On March 1, 2019, Plaintiffs filed a Motion for Leave to Amend Second Amended Complaint seeking to reallege their dismissed claims for piercing the corporate veil and for unfair and deceptive trade practices. ("Motion to Amend", ECF No. 91.)  On April 23, 2019, following briefing by the parties, the Court denied the Motion to Amend.  (ECF No. 108.)

21.     On March 1, 2019, Plaintiffs moved for summary judgment on all of its remaining claims and on all of FLC's counterclaims.  (Pls.' Mot. for SJ, ECF No. 88.)  Plaintiffs' Motion has been fully briefed.  (Pls.' Br. Supp. Mot. for SJ, ECF No. 89; Defs.' Br. Opp. Pls.' Mot. for SJ, ECF No. 104; Pls.' Reply Supp. Mot. for SJ, ECF No. 105.)  However, FLC subsequently dismissed its counterclaims for breaches of the Management Agreement. (ECF No. 120.)  Plaintiffs make no separate argument for dismissal of FLC's remaining counterclaim for attorneys' fees.  For that reason, Plaintiffs' Motion on FLC's counterclaims is DENIED as MOOT.

22.     On March 1, 2019, Defendants filed Defendants' Motion.  (Defs.' Mot. for SJ, ECF No. 86.)  Defendants' Motion is fully briefed.  (Defs.' Br. Supp. Mot. for SJ, ECF No. 87; Pls.' Br. Opp. Defs.' Mot. for SJ, ECF No. 103; Defs.' Reply Supp. Mot. for SJ, ECF No. 106.)

23.     The Court held a hearing on the Motions on May 15, 2019.  Plaintiffs' and Defendants' Motions on Plaintiffs' two remaining claims for breach of the Agreement (First Cause of Action) and constructive trust (Fifth Cause of Action), are ripe for determination.

## II.     ANALYSIS

24.     "Summary judgment is appropriate if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that any party is entitled to judgment as matter of law."  *Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 523, 723 S.E.2d 744, 747 (2012).  An issue is "material" if

"resolution of the issue is so essential that the party against whom it is resolved may not prevail." *McNair v. Boyette*, 282 N.C. 230, 235, 192 S.E.2d 457, 460 (1972). The moving party bears "the burden of clearly establishing lack of a triable issue to the trial court." *N.C. Farm Bureau Mut. Ins. Co. v. Sadler*, 365 N.C. 178, 182, 711 S.E.2d 114, 116 (2011) (quotation marks omitted). The moving party may meet this burden by "proving an essential element of the opposing party's claim does not exist, cannot be proven at trial, or would have been barred by an affirmative defense." *Variety Wholesalers, Inc.*, 365 N.C. at 523, 723 S.E.2d at 747. All evidence is viewed in the light most favorable to the nonmoving party with the benefit of all reasonable inferences. *Bruce-Terminix Co. v. Zurich Ins. Co.*, 130 N.C. App. 729, 733, 504 S.E.2d 574, 577 (1998).

25. "Once the party seeking summary judgment makes the required showing, the burden shifts to the nonmoving party to produce a forecast of evidence demonstrating specific facts, as opposed to allegations, showing that he can at least establish a *prima facie* case at trial." *Gaunt v. Pittaway*, 139 N.C. App. 778, 784–85, 534 S.E.2d 660, 664 (2000). As recently reiterated by the North Carolina Court of Appeals, the burden on the non-movant goes beyond merely producing some evidence or a scintilla of evidence in support of its claims. Rather,

[i]f the movant meets [its] burden, the nonmovant must take affirmative steps to set forth specific facts showing the existence of a genuine issue of material fact. An adverse party may not rest upon the mere allegations or denials of his pleading. A genuine issue of material fact is one that can be maintained by substantial evidence. Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion and means more than a scintilla or a permissible inference.

*Khashman v. Khashman*, 2017 N.C. App. LEXIS 715, at \*15 (Sept. 5, 2017) (citations and internal quotation marks and modifiers omitted).

26. The Court must view the evidence in the light most favorable to the nonmovant. *Dobson*, 352 N.C. at 83, 530 S.E.2d at 835. However, the nonmovant "may not rest upon the mere allegations or denials of his pleading, but his response, by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial. If [the nonmovant] does not so respond, summary judgment, if appropriate, shall be entered against [the nonmovant]." N.C.G.S. § 1A-1, Rule 56(e).

27. This case has been distilled, through motions practice and voluntary dismissals, to a dispute over Plaintiffs' claim that FLC breached the Management Agreement by failing to acquire the Disputed Property. Both parties seek summary judgment on Plaintiffs' claim for breach of the Management Agreement. Defendants first contend the claim for breach of the Management Agreement is barred by the statute of limitations. (ECF No. 87, at pp. 5–8.) Plaintiffs argue that the First Cause of Action is timely under the ten-year limitations period applicable to the claim. (ECF No. 103, at pp. 2–9.)

28.    Alternatively, Defendants argue that the unambiguous terms of the Agreement establish that FLC was not obligated to acquire any of the Land, and that Plaintiffs' obligations to develop, market, and sell property in the Development only arose if FLC chose to acquire portions of the Land. (ECF No. 87, at pp. 10–18.)

29.    On the other hand, Plaintiffs argue that the Management Agreement, interpreted as a whole, unambiguously created an implied obligation on FLC to acquire or "make reasonable efforts to acquire" all of the Land, including the Disputed Property. (ECF No. 89, at pp. 4–11.) Plaintiffs contend FLC's failure to acquire or attempt to acquire the Disputed Property breached the Management Agreement. (*Id*.)

30.    Plaintiffs also argue that, if the Court concludes that the Management Agreement is ambiguous, the undisputed facts surrounding the negotiation and performance of the Agreement establish as a matter of law that it was the intent of the parties that FLC be required to acquire the Land or make good faith efforts to acquire the Land. (ECF No. 89, at pp. 11–12.)

## A. Defendants' Statute of Limitations Arguments

31.    Defendants argue that Plaintiffs' First Cause of Action for breach of the Management Agreement is barred by the statute of limitations. (ECF No. 87, at pp. 5–8.) It is undisputed that the agreement was signed under seal and, consequently, the claim for breach of the Agreement is governed by the ten-year statute of limitations set forth in N.C.G.S. § 1-47(2). This lawsuit was filed on August 8, 2017. Accordingly, to be time-barred, Plaintiffs' claim for breach of contract would have to have accrued before August 8, 2007.

32.    Defendants argue that FLC put Plaintiffs on notice that Defendants did not believe the Disputed Property was subject to the Agreement in 1997 and in 2002—more than ten years before Plaintiffs filed this action.[4] Defendants contend that these notices were anticipatory repudiations, and consequently breaches, of the Management Agreement. (ECF No. 87, at pp. 5–8.)  A breach of contract "may . . . occur by repudiation." *D.G. II, LLC v. Nix*, 211 N.C. App. 332, 338, 712 S.E.2d 335, 340 (2011) (*quoting Profile Invs. No. 25, LLC v. Ammons East Corp.*, 207 N.C. App. 232, 236, 700 S.E.2d 232, 235 (2010)).  "Repudiation is a positive statement by one party to the other party indicating that [they] will no or cannot substantially perform [their] contractual duties." *Id.*  However,

> [f]or repudiation to result in a breach of contract, the refusal to perform must be of the whole contract or of a covenant going to the whole consideration, and must be distinct, unequivocal, and absolute[.] Furthermore, even a distinct, unequivocal, and absolute refusal to perform is not a breach unless it is treated as such by the adverse party. Upon repudiation, the non-repudiating party may at once treat it as a breach of the entire contract and bring his action accordingly.  Thus, breach by repudiation depends not only upon the statements and actions of the allegedly repudiating party but also upon the response of the non-repudiating party.

*D.G. II,* LLC, 211 N.C. App. at 338–39, 712 S.E.2d 335, 340–41 (quoting *Prolive Invs. No. 25, LLC*, 207 N.C. App. at 237, 700 S.E.2d at 235–36) (internal citations and quotation marks omitted).

---

[4] Defendants also argue that statements made by Plaintiffs' attorneys in correspondence with Defendants' counsel in 2013 and 2014 were repudiations of the Agreement.  Since the Court has determined that a ten-year limitations period applies to the claim, it need not address the arguments regarding the 2013 and 2014 correspondence.

33. Defendants claim that David informed Plaintiffs of FLC's position that the Disputed Property was not part of the Agreement and that FLC was not obligated to purchase the Disputed Property in a meeting held with Plaintiffs in 1997. (Ferrell Depo., ECF No. 90 at Ex. G, pp. 223–25.) In his deposition, David testified that "we made [Plaintiffs] aware in the late fall [of 1996] or early spring of 1997 that we did not believe that the north side [Disputed Property] was a part of the agreement . . . [i]t was in a meeting." (*Id.* at pp. 223, 224–25.) Plaintiffs deny that David Ferrell told them that FLC did not believe that the Disputed Property was part of the Agreement position in 1997. (D. Ward Aff., ECF No. 103.1, at ¶ 6; M. Hunter Aff., ECF No. 103.2, at ¶ 10.) To the contrary, Plaintiffs provided evidence that "W&W performed development work within the Disputed Property after 1997 and with the encouragement of FLC. Plaintiffs would never have performed work pertaining to the Disputed Property unless it was understood and agreed that the Disputed Property was part of and subject to the Agreement." (ECF No. 103.2, at ¶ 10.) Accordingly, the question of whether David notified Plaintiffs in 1997 that FLC did not believe the Disputed Property was part of the Agreement, thereby anticipatorily repudiating the Management Agreement, is in dispute.

34. Defendants also contend that they repudiated the Management Agreement in 2002. (ECF No. 87, at pp. 6–7.) It is undisputed that in March 2002, FLC proposed that the parties enter into an amended agreement that expressly removed the Disputed Property from the Land. (ECF No. 90, at Ex. M.) Plaintiffs admit that in conjunction with presenting the proposed amended agreement, David

told Plaintiffs that FLC did not believe the Disputed Property was covered by the Management Agreement. (Michael Hunter Dep., ECF No. 87.5, at p. 56.) However, Plaintiffs told David that they disagreed with FLC's position. (*Id.*)

35. The proposed amended agreement and David's statement were not a repudiation of the Management Agreement. First, FLC's claim that the Disputed Property was not covered by the Agreement was not a disavowal of the entire Agreement, but only the obligations regarding the Disputed Property. *Edwards v. Proctor,* 173 N.C. at 44, 91 S.E. at 585 (holding that, to be a repudiation, "the refusal to perform must be of the whole contract or of a covenant going to the whole consideration").

36. Second, "[i]n order to maintain a claim for anticipatory breach, the words or conduct evidencing the renunciation or breach must be a 'positive, distinct, unequivocal, and absolute refusal to perform the contract' when the time fixed for it in the contract arrives." *Messer v. Laurel Hill Assoc.*, 93 N.C. App. 439, 443, 378 S.E.2d 220, 223 (1989). David's notice to Plaintiffs that FLC did not consider the Disputed Property to be subject to the Agreement was not an unequivocal statement that FLC would never acquire the Disputed Property, but merely an expression of FLC's position regarding its interpretation of one part of the Agreement.

37. Finally, it is undisputed that Plaintiffs did not choose to treat the proposed amended agreement or David's statements as a repudiation in 2002. A repudiation is a breach of the contract only when the non-breaching party chooses to treat it as a breach. *Gordon v. Howard*, 94 N.C. App. 149, 153, 379 S.E.2d 674, 676

(1989) ("The renunciation [of the contract] itself does not *ipso facto* constitute a breach. It is not a breach of the contract unless it is treated as such by the adverse party."). Instead, Plaintiffs continued to perform under the Management Agreement through 2017 or 2018.

38. Therefore, Defendants have failed to present undisputed evidence that they breached the Management Agreement prior to August 8, 2007, and they are not entitled to judgment as a matter of law on their arguments that the statute of limitations bars Plaintiffs' First Cause of Action for breach of the Agreement.

**B.      First Cause of Action: Breach of Contract**

39. Plaintiffs and Defendants all argue that the Management Agreement is unambiguous and each seek summary judgment in their favor on Plaintiffs' First Cause of Action for breach of Management Agreement. Defendants argue that the Management Agreement states only that FLC "intends" to acquire the Land but does not obligate FLC to acquire the Land. Plaintiffs contend that the language and terms of the Agreement, considered as a whole, unambiguously create an obligation on FLC to acquire all of the Land, including the Disputed Property, or make their best efforts to acquire it.

40. The Court previously concluded that the Management Agreement was ambiguous regarding the question of whether FLC was required to acquire the Land in the Order on Motion to Dismiss. *W & W Partners, Inc.*, 2018 NCBC LEXIS 52, at *20–21. "Whether or not the language of a contract is ambiguous [ ] is a question for the court to determine." *Lynn v. Lynn,* 202 N.C. App. 423, 432, 689 S.E.2d 198, 205

(2010). "It is the general law of contracts that the purport of a written instrument is to be gathered from its four corners, and the four corners are to be ascertained from the language used in the instrument." *Carolina Power & Light Co. v. Bowman*, 229 N.C. 682, 693–94, 51 S.E.2d 191, 199 (1949).

41. Neither Plaintiffs nor Defendants moved the Court to reconsider Order on Motion to Dismiss pursuant to Rule 54(b). *See* N.C.G.S. § 1A-1, Rule 54(b) (stating that interlocutory orders are "subject to revision at any time before the entry of judgment adjudicating all the claims and the rights and liabilities of all the parties"). However, Plaintiffs and Defendants raised some arguments regarding the Summary Judgment Motions not raised at the motion to dismiss stage. "A motion for reconsideration is not a vehicle to identify facts or legal arguments that could have been, but were not, raised at the time the [motion to dismiss] was pending." *W4 Farms, Inc. v. Tyson Farms, Inc.*, 2017 NCBC LEXIS 99, at *5 (N.C. Super. Ct. Oct. 19, 2017) (quoting *Julianello v. K-V Pharm. Co.*, 791 F.3d 915, 923 (8th Cir. 2015)) (quotation marks omitted). Even if the Court were inclined to reconsider its prior ruling, it is unpersuaded by the new arguments and concludes that the reasoning applied in the Order of Motion to Dismiss remains apposite, and finds it controlling as to the Motions for Summary Judgment. 2018 NCBC LEXIS 52, at *17–21.

42. The Court now turns to the evidence of the parties' intent. Plaintiffs contend that, "[s]hould the Court be unable to determine from the Agreement itself that the parties intended to impose on FLC the obligation to acquire the Land, the forecast of undisputed evidence establishes such intention." (ECF No. 89, at pp. 11–

12.) In contrast, Defendants claim, "if the Court resorts to extrinsic evidence, there are genuine issues of disputed fact" regarding the parties' intent. (ECF No. 104, at p. 18.) In this case, the facts about the parties' intentions and understandings about whether the Management Agreement obligated FLC to acquire the Land are hotly disputed.

43. Defendants presented evidence supporting its claim that the parties always understood the words "intends to acquire" to mean that FLC had the "prerogative" to choose whether and which land to include in the Management Agreement, (L. Adams Depo., ECF No. 90 at Ex. A, p. 36); that the Ferrell family "never intended on selling" the Disputed Property, (ECF No. 90 at Ex. G, p. 222); and that David communicated as much to Plaintiffs sometime in the Spring of 1997, (*Id.* at p. 223). Defendants also elicited testimony from Michael Hunter, being deposed as the Rule 30(b)(6) representative for W&W Partners and Chase, that the word "intends" generally can mean the person intending to do something can change their mind later. (M. Hunter Depo., ECF No. 87.5, at p. 50 ("Q: If you intend to do something, can you change your mind? . . . A: Sure. It doesn't make it right.").) Seconds later in that same deposition, Michael Hunter testified that he believed that an intention was synonymous with a requirement. (*Id.* ("Q: Does an intention mean you have to do it? A: Absolutely."))

44. On the other hand, Plaintiffs presented evidence that the parties understood FLC was obligated to acquire the Land, and that this basic understanding underlies the entirety of the Management Agreement. (Ward Aff., ECF No. 103.2, at

¶¶ 4, 11, 14; M. Hunter Depo., ECF No. 87.5, at pp. 60–61, 67.) Plaintiffs also argue David Ferrell's Notice to Proceed on March 28, 1996 instructing W&W to begin the rezoning and development of the Land before FLC had acquired the Land, supports its claim that David Ferrell understood that FLC was obligated under the Agreement to acquire that land. (ECF No. 89, at p. 12 ( citing D. Ferrell Depo., ECF No. 90 at Ex. G., pp. 21–25).) Plaintiffs also presented circumstantial evidence of the Ferrell family's intent to obligate FLC to acquire all of the Land, such as: inclusion of the total 368.79 acres in Carpenter Village in the estimated project costs, which includes the Disputed Property, and David Ferrell's signature on a document representing that FLC was the owner of approximately 400 acres of land in Wake County being developed as Carpenter Village, (ECF No. 90 at Ex. G, pp. 43–44.)

45. "If an agreement is ambiguous, . . . , and the intention of the parties is unclear, interpretation of the contract is for the jury." *Cleland v. Children's Home, Inc.*, 64 N.C. App. 153, 156, 306 S.E.2d 587, 589 (1983) (citing *Silver v. Board of Transportation*, 47 N.C. App. 261, 270, 267 S.E.2d 49, 55 (1980)). "[Where] a genuine issue of material fact exists in regard to the intention of the parties, summary judgment [is] not appropriate." *Id.* at 157, 306 S.E.2d at 590.

46. In the face of conflicting evidence, the Court is unable to determine as a matter of law the intent of the parties as to whether the Agreement obligated FLC to acquire any of the Land as a matter of law. Accordingly, the Motions for Summary Judgment on Plaintiffs' first claim for breach of contract should be DENIED.

## C. Fifth Cause of Action: Constructive Trust

47.     For a fifth cause of action, Plaintiffs seek a constructive trust over the proceeds of the sale of the Disputed Property that is in the hands of Ferrell Investments.  (ECF No. 13, at ¶¶ 66–68.)  "When a court impresses a constructive trust upon property for the benefit of a claimant, it exercises its equitable powers to fashion remedies."  *Weatherford v. Keenan*, 128 N.C. App. 178, 179, 493 S.E.2d 812, 813 (1997).  "[A] constructive trust is not a standalone claim for relief or cause of action."  *LLG-NRMH, LLC v. Northern Riverfront Marina & Hotel, LLLP*, 2018 NCBC LEXIS 105, at *14 (N.C. Super. Ct. Oct. 9, 2018) (citing *Weatherford* as quoted herein).

> A constructive trust is a duty, or relationship, imposed by courts of equity to prevent the unjust enrichment of the holder of title to, or of an interest in, property which such holder acquired through fraud, breach of duty or some other circumstance making it inequitable for him to retain it against the claim of the beneficiary of the constructive trust.

*Variety Wholesalers, Inc. v. Salem Logistics Traffic Servs., LLC*, 365 N.C. 520, 530, 723 S.E.2d 744, 751 (2012) (quoting *Wilson v. Crab Orchard Dev. Co.*, 276 N.C. 198, 211, 171 S.E.2d 873, 882 (1970).  "In the absence of [a fiduciary] relationship, [the plaintiff] faces the difficult task of proving some other circumstance making it inequitable for" for a defendant to possess the property at issue.  *Id.* at 520–31, 723 S.E.2d at 752 (quotation omitted).

48.     Plaintiffs argue that they are entitled to summary judgment on their request for a constructive trust because,

> [s]hould the Court conclude that FLC breached the Agreement and its contractual duty of good faith owed to Plaintiffs, . . . it is indisputable that [Ferrell Investments], and David and Luanne, would be unjustly enriched if they are allowed to retain the proceeds (or exchanged property) they received as a result of their breach of duty to Plaintiffs.

(ECF No. 89, at p. 23.) The Court has concluded that Plaintiffs are not entitled to summary judgment on their claim for breach of the Management Agreement. Accordingly, to the extent it seeks judgment in Plaintiffs' favor on the request for a constructive trust, Plaintiffs' Motion should be DENIED. *Azure Dolphin, LLC v. Barton*, 2017 NCBC LEXIS 90, at *29 (N.C. Super. Ct. Oct. 2, 2017) ("Having dismissed all of Plaintiffs' underlying causes of action, the Court also grants the motion to dismiss the[ ] remedial claim[ of constructive trust].").

49.     Defendants also seek summary judgment on Plaintiffs' fifth cause of action. In support of their position, Defendants argue that Plaintiffs have not produced any evidence supporting a finding that a constructive trust should be placed on the proceeds from the sale of the Disputed Property by Ferrell Investments. (ECF No. 87, at pp. 19–21.) Defendants argue that there is no evidence Ferrell Investments had a fiduciary relationship with or owed a duty to Plaintiffs. (*Id.* at p. 21.) Defendants also argue that Plaintiffs have an adequate remedy at law of monetary damages for their breach of contract claim and should not be able to invoke the equitable remedy of constructive trust. (*Id.* at p. 20 (*citing Morris v. Scenera Research, LLC*, 368 N.C. 857, 867, 788 S.E.2d 154, 161 (2016) (holding money damages usually sufficient to remedy a claim for breach of contract and equitable

remedy of rescission available only "only when a material breach occurs *and* all legal remedies fall short of compensating the injured party for its loss")).)

50. Plaintiffs do not contend, and have not presented evidence, that Ferrell Investments had a fiduciary relationship to Plaintiffs. Instead, they argue that they have established other equitable grounds for imposition of a constructive trust over Ferrell Investments. Plaintiffs contend that David and Luanne, as controlling members of both FLC and Ferrell Investments, failed to transfer the Disputed Property from Ferrell Investments to FLC, caused Ferrell Investments to sell the Disputed Property to a third party, and have drained assets out of FLC "for purposes of preventing Plaintiffs from having a legal remedy for FLC's intentional failure to acquire the Disputed Property." (ECF No. 103, at pp. 20–22.) David and Luanne's actions, Plaintiffs argue, warrant the Court imposing a constructive trust on Ferrell Investments' property for the benefit of Plaintiffs.

51. Plaintiffs' argument is based on their (now dismissed) assertion of the legal theory of piercing the corporate veil of FLC and Ferrell Investments via David and Luanne. *W & W Partners, Inc.*, 2018 NCBC LEXIS 52, at *26 (N.C. Super. Ct. May 22, 2019). In fact, Plaintiffs cite repeatedly to the brief filed in support of their Motion to Amend the SAC to reassert the veil-piercing claim and bring David and Luanne back into this case as Defendants. (ECF No. 103, at p. 21 ("As described more fully in Plaintiffs' Brief in Support of Motion to Amend Second Amended Complaint, David and Luanne are using [Ferrell Investments] purely for purposes of preventing Plaintiffs from having a legal remedy for FLC's intentional failure to acquire the

Disputed Property"); p.22 ("As described in Plaintiffs' Brief in Support of Motion to Amend, there is no distinction between the Ferrell family and its various entities.").) The Court denied the motion to amend, the veil-piercing claim was not reasserted, and David and Luanne are not currently Defendants. (ECF No. 108.)

52.    Absent a veil-piercing theory by which FLC's obligations could be imposed on Ferrell Investments, the Court must consider FLC and Ferrell Investments as separate, distinct legal entities, and cannot impose the obligations or duties owed by FLC upon Ferrell Investments. As a result, the Court will not consider the arguments or evidence presented by Plaintiffs relating to whether it is appropriate to pierce the corporate veils of FLC and Ferrell Investments.

53.    Plaintiffs have made no other argument that Ferrell Investments owed any duty directly to Plaintiffs, committed some fraud on Plaintiffs, or that there are some other circumstances making it inequitable for Ferrell Investments to retain the proceeds from the sale of the Disputed Property.  Therefore, to the extent the Motions seek summary judgment on the Fifth Cause of Action for constructive trust, Plaintiffs' Motion should be DENIED, and Defendants' Motion should be GRANTED.

## III.    CONCLUSION

THEREFORE, IT IS ORDERED that the Summary Judgment Motions are decided of as follows:

> 1. To the extent that it seeks summary judgment on FLC's counterclaims, Plaintiffs' Motion is DENIED as MOOT.

2. To the extent it seeks summary judgment on the First Cause of Action for breach of contract, Plaintiffs' Motion is DENIED.

3. To the extent it seeks summary judgment on the First Cause of Action for breach of contract, Defendants' Motion is DENIED

4. To the extent it seeks summary judgment on the Fifth Cause of Action for constructive trust, Plaintiffs' Motion is DENIED.

5. To the extent it seeks summary judgment on the Fifth Cause of Action for constructive trust, Defendants' Motion is GRANTED.

SO ORDERED, this the 25th day of July, 2019.

 /s/ Gregory P. McGuire
Gregory P. McGuire
Special Superior Court Judge for
Complex Business Cases